**MID–AMERICAN WASTE SYSTEMS, INC., and Mid–American Waste Systems of Indiana, Inc., Plaintiffs–Appellants, Cross–Appellees,**

v.

**CITY OF GARY, INDIANA, et al., Defendants–Appellees, Cross–Appellants.**

Nos. 94–3602, 94–3729.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1995.

Decided Feb. 22, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied March 20, 1995.

Steven R. Crist (argued), Michael D. Sears, Marilyn R. Holscher, Patrick B. McEuen, Singleton, Crist, Patterson, Austgen & Lyman, Munster, IN, for Mid–American Waste Systems, Inc., Mid–American Waste Systems of Indiana, Inc.

Gilbert King, Jr., CC, MacArthur Drake (argued), Hamilton L. Carmouche, Margaret L. Felton (argued), City of Gary Law Dept., Gary, IN, for City of Gary, Thomas Barnes, Marvin Exom, Douglas Wright, Gardest Gillespie, Gerald Hayes, Frank Ballard, Cleve-

land Rouster, Cleo Wesson, Leon Hamilton, Roy Pratt, Charles Hughes, Dorothy Allen.

Before COFFEY and EASTERBROOK, Circuit Judges, and McDADE, District Judge.*

EASTERBROOK, Circuit Judge.

The status of the Gary Landfill has been the subject of continuous litigation since Indiana's pollution control officials ordered its closure in 1977. Throughout the 1980s the City of Gary continued to operate the landfill, sometimes in violation of both administrative and judicial orders. An agreement in 1988 permitted the City to continue operating the landfill until mid–1991 on condition that it engage a responsible firm to stop the seepage and operate the landfill. See *State ex rel. Prosser v. Lake Circuit Court*, 565 N.E.2d 751 (Ind.1991), after remand, 603 N.E.2d 181 (Ind.App.1992). The City chose Mid–American Waste Systems. A lease between the City and Mid–American was approved by the court in June 1990, and Mid–American took over the landfill. It has since made at least $10 million in capital improvements; Mid–American says that the total is $19 million. Early in 1994 the City began to limit Mid–American's ability to deposit waste, on occasion sending police to turn trucks away. Relations deteriorated, with police officers escorting the City's own dump trucks into the landfill so that they could deposit garbage without paying Mid–American, and on October 26, 1994, the City barred all of Mid–American's trucks from the property.

Mid–American believes that its lease runs until the Gary Landfill is full, an event that it believes lies many years in the future. The City asserts that, because the lease lacks a definite term of years, it may be canceled at will—which the City says it has now done in order to conserve remaining space in the landfill for local residents. In September 1994 Mid–American filed this suit under 42 U.S.C. § 1983, contending that the lease transferred to it all of the air rights over the landfill, and seeking an injunction against the City's interference with its access to these air rights. Mid–American characterized the air rights (and its leasehold interest as a whole) as "property," with which the City could not interfere except by due process of law. Sending armed police to back up your side of a contract dispute is a far cry from due process of law, Mid–American told the court. On October 27, the day after the City forbade all entry to Mid–American's trucks, the district court issued a temporary restraining order providing:

> The City of Gary, all Defendants in this case, and all other City of Gary officials and employees are ordered to cease and desist from interfering with Mid–American Waste's operation of the Gary Landfill unless said action is based upon a valid state statute or city ordinance. *Mid–American Waste is to continue accepting the City of Gary's garbage for free, and the City of Gary will allow Mid–American Waste to accept garbage from transfer trucks up to the specified tonnage limits in the agreement.*

The italicized language was added on October 28. It had no effect. The City did not permit Mid–America's trucks to enter the landfill on October 27, 28, 29, 30, or 31, and the court convened a hearing on November 1 to decide whether the City and its top officials, including the Mayor, should be held in contempt of court. It heard evidence, concluded that the City had defied the order (it refused Mid–American access even as the hearing continued), and on November 4 ordered defendants to pay fines of $25,000 per day until it restored Mid–American's access under the lease. Gary argued that its actions were justified under the proviso allowing it to enforce valid ordinances because the landfill was out of compliance with state and city health codes, but the judge found "that this 'reason' for terminating the contract ... was concocted after the fact and is pretextual." The fine was retroactive to October 31, a day chosen to avoid any possibility of a penalty for actions before the TRO had been widely circulated.

The same day he held Gary in contempt of court and imposed the fines, the judge began a hearing on Mid–American's motion for a

---

* Hon. Joe Billy McDade, of the Central District of Illinois, sitting by designation.

preliminary injunction. This had a happier outcome for defendants. On November 15, 1994, the judge declined to order any further relief and dismissed the action with prejudice, ruling that Mid–American lacks a "property" interest in the contract. Although Mid–American may well be right that the City interfered with its leasehold and air rights, the court held, these are mere contract rights. Only contracts creating a protected status establish the sort of "property" with which the due process clauses of the fifth and fourteenth amendments are concerned. Both sides have appealed: Mid–American insists that the contract establishes full-blooded "property," and defendants ask us to vacate the fines. We start with Mid–American's arguments.

██ Mid–American reminds us that many of this circuit's cases define "property" by reference to a formula such as: property is whatever is "securely and durably yours ... as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain". *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir.1983). See also, e.g., *Wallace v. Robinson*, 940 F.2d 243, 246–47 (7th Cir.1991) (en banc). If you have a legal entitlement, you have "property." *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 788 n. 21, 100 S.Ct. 2467, 2477, 65 L.Ed.2d 506 (1980); *Upadhya v. Langenberg*, 834 F.2d 661, 665 (7th Cir.1987). If not, not. *Perry v. Sindermann*, 408 U.S. 593, 602 n. 7, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972); *Miller v. Crystal Lake Park District*, 47 F.3d 865 (7th Cir.1995). These are among the many efforts to implement the conclusion of *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), that "property" depends on "a legitimate claim of entitlement", a formula that leads us to the terms of state laws and regulations—and contracts.

Many contracts establish "legitimate claims of entitlement." How could they not? Courts routinely enforce them, awarding damages against those who go back on their word. The Constitution itself protects them; Art. I § 10 cl. 1 provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts". If the state confiscates a leasehold interest, it must pay "just compensation" under the takings clause of the fifth amendment—a provision that has been applied to the states through the due process clause of the fourteenth amendment, *Chicago, Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226, 233–41, 17 S.Ct. 581, 583–86, 41 L.Ed. 979 (1897), a step that is possible only if leaseholds are "property." Yet the conclusion that all contract rights are property rights does more than protect them from interference under the contracts clause and require compensation under the takings clause; it has the potential to move ordinary contract litigation between private parties and state actors into federal court, despite the lack of diversity jurisdiction, by making every breach of contract case a federal issue. If the plaintiff is right that its contract creates a particular entitlement, the case belongs in federal court; but if the defendant is right, and it is entitled to act as it did, then the case belongs in state court. On this understanding Mid–American is entitled to litigate in federal court only if its leasehold continues till the Gary Landfill is jam packed; if the lease is terminable at will, then Mid–American lacks a "legitimate claim of entitlement" and the case should be dismissed. To decide the threshold question of the existence of "property," the judge must resolve the case on the merits.

Courts have resisted the implication that every government-contract case belongs in federal court. At least three circuits have held that only contracts creating a special status (employment, for example) count as "property." Other contracts—these courts call them "mere" contracts—do not create property and therefore must be enforced in state court. See *S & D Maintenance Co. v. Goldin*, 844 F.2d 962 (2d Cir.1988); *Unger v. National Residents Matching Program*, 928 F.2d 1392, 1397–1400 (3d Cir.1991); *San Bernardino Physicians' Services Medical Group v. County of San Bernardino*, 825 F.2d 1404 (9th Cir.1987). Federal courts using this approach eject business contract cases without regard to the strength of the plaintiff's claim on the merits. The district court, citing *Unger*, concluded that Mid–American and Gary have a "mere" contract and therefore

declined to decide whether the City has broken its promise.

Reconciling cases such as *Unger* with the positivist model of *Roth* is hard to do given the Supreme Court's rejection of Justice Rehnquist's bitter-with-the-sweet approach. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). If a contract creates rights specific enough to be enforced in state court by awards of damages or specific performance, then it creates a legitimate claim of entitlement; and if it creates such a claim, it is "property." Our court has accordingly treated some contracts that other circuits would put in the "mere contract" group as property interests. Compare *T.A. Moynahan Properties, Inc. v. Lancaster Village Co–Op, Inc.,* 496 F.2d 1114 (7th Cir.1974); and *Vail v. Board of Education,* 706 F.2d 1435 (7th Cir.1983), affirmed by an equally divided Court, 466 U.S. 377, 104 S.Ct. 2144, 80 L.Ed.2d 377 (1984); with *Brown v. Brienen,* 722 F.2d 360 (7th Cir. 1983). Other cases search for legitimate claims of entitlement in contracts without suggesting that broad categories of contracts can be disqualified from "property" status. E.g., *Triad Associates, Inc. v. Chicago Housing Authority,* 892 F.2d 583 (7th Cir.1989); *Downtown Auto Parts, Inc. v. Milwaukee,* 938 F.2d 705 (7th Cir.1991). We do not think it possible to follow the path of *Unger* and exclude all commercial leases from the realm of "property" without overruling *Moynahan* and casting doubt on authority as venerable as *Chicago, Burlington & Quincy R.R.*

Gary draws comfort from *Yatvin v. Madison Metropolitan School District,* 840 F.2d 412, 416 (7th Cir.1988), which remarks that "unless every breach of every public contract is to be actionable as a violation of constitutional rights, it is necessary to distinguish between 'mere' contract rights and property rights created by contract." The right way to understand this distinction starts with the recognition that the word following "due" is "process." Many statutes, regulations, and contracts create entitlements of the form "if X then Y" or "unless X then not-Y": if a family has income below the poverty level, it is entitled to welfare benefits; unless a public employee performs poorly, he is entitled to keep his job; unless a prisoner violates a rule of the prison, he is entitled to good-time credits. The if-then quality of the rule sets up a legitimate claim of entitlement to a particular decision if the condition holds. The "process" of which the Constitution speaks is a procedure to find out whether the condition has been satisfied. "Due process comes into play when substantive rules limit the reasons that support action. Procedures ensure that the necessary basis exists." *Wallace,* 940 F.2d at 247. But when there is no factual dispute over a condition with dispositive significance, the state need not supply a fact-finding process. "When there are no necessary conditions of action, there is nothing to hold a hearing about." *Ibid.*

Many contract disputes, of which this one is an example, are about substance rather than process. They pose questions of the form: "What does clause X of the contract mean?" If the air rights clause means what Mid–American thinks it does, then Gary has violated the contract. (Gary does not contend that the landfill can hold no more waste; it dispatches garbage trucks there daily.) If the absence of a specific duration means what Gary thinks it does, then the City may end the lease at will. There is no factual dispute requiring a hearing. Mid–American believes that it has a valid leasehold that would continue if Gary offered it a hundred hearings. The dispute is substantive. And the due process clause does not require, or even permit, federal courts to enforce the substantive promises in state laws and regulations. See *Nordlinger v. Hahn,* —— U.S. ——, —— n. 8, 112 S.Ct. 2326, 2335 n. 8, 120 L.Ed.2d 1 (1992); *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 202, 109 S.Ct. 998, 1006–07, 103 L.Ed.2d 249 (1989); *Snowden v. Hughes,* 321 U.S. 1, 11, 64 S.Ct. 397, 402–03, 88 L.Ed. 497 (1944); *Evans v. Chicago,* 10 F.3d 474, 481 (7th Cir.1993) (en banc); *Archie v. Racine,* 847 F.2d 1211, 1215–18 (7th Cir.1988) (en banc). If a state's violation of its own laws and regulations does not violate the due process clause, it is hard to see how failure to keep a promise contained in a contract can violate the due process clause. Cf. *Bishop v.*

*Wood,* 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976).

To put this in familiar terms, Mid–American's claim sounds in substantive rather than procedural due process. Whatever scope "substantive due process" has for cases of personal liberty, it has none in business law beyond ensuring that states pay just compensation for property interests they take—and perhaps ensuring that states do not take private property for private use. See *River Park, Inc. v. Highland Park,* 23 F.3d 164 (7th Cir.1994); *Gamble v. Eau Claire County,* 5 F.3d 285, 286–87 (7th Cir.1993). Even when used to protect personal liberties, substantive due process is limited to the domain of fundamental rights. *Reno v. Flores,* —— U.S. ——, ——, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993). Just the other day we held that selling spray paint is not a fundamental liberty. *National Paint & Coatings Ass'n v. Chicago,* 45 F.3d 1124, 1129 (7th Cir.1995). Depositing garbage in landfills is not exactly a fundamental right, either. Disposition of waste is a highly regulated industry. A claim that the Constitution protects this industry from public control—even when the landfill is public property—would bring nothing but belly laughs. Cf. *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). Mid–American is in this for the money, not to advance a political principle or to defend the right of every American to life, liberty, and the pursuit of happiness. "Corporations do not have fundamental rights; they do not have liberty interests, period. Investors may have such rights, and inhibitions on the conduct of organizations may influence investors' and members' ability to exercise their own rights.... But plaintiffs do not assert that [the] ordinance directly or indirectly affects a fundamental right possessed by their investors. The only interest at stake is the interest in obtaining the maximum return on investment. That is not a 'fundamental' right." *National Paint,* 45 F.3d at 1129–30 (citations omitted).

Mid–American has, of course, a legitimate interest in the procedure for divining the meaning of its lease. That interest is served, however, not by an administrative hearing prior to breach but by adjudication in a court. The adequacy of litigation as a means to determine the meaning of a contract is a premise of our legal system. Mid–American's opportunity to litigate in the courts of Indiana (where it has already filed suit) therefore is all the process "due" for ordinary claims of breach of contract. This is not to say that Mid–American must "exhaust state remedies." Exhaustion is unnecessary under § 1983. *Felder v. Casey,* 487 U.S. 131, 147–48, 108 S.Ct. 2302, 2311–12, 101 L.Ed.2d 123 (1988); *Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). It is also not to invoke the principle of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and *Easter House v. Felder,* 910 F.2d 1387 (7th Cir.1990) (en banc). *Parratt* deals with situations in which state actors ought to provide some kind of hearing before acting, but mistake or other happenstance intervenes. *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). If a prior hearing cannot be achieved, and the "real" hearing will come in court, a state court is as good as a federal court—better than the federal court if the real issue is how state and local governments carry out their missions under state law. See *Thornton v. Barnes,* 890 F.2d 1380, 1389–90 (7th Cir.1989). The point we are making, by contrast, is that when the issue is the meaning of a commercial contract, a prior hearing is *unnecessary,* and the opportunity to litigate in state court is all the process "due" to determine whether the state has kept its promise.

*Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 197–200, 105 S.Ct. 3108, 3122, 87 L.Ed.2d 126 (1985), concludes that the opportunity to litigate in state court after the fact supplies all the process due for claims of inverse condemnation by excessive regulation. *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), reaches the same conclusion for claims of corporal punishment in the schools. What is good enough for children about to be spanked is good enough for corporations seeking to en-

force commercial contracts. Due process does not require hearings before corporations may be required to pay money or do expensive things. *Thunder Basin Coal Co. v. Reich,* —— U.S. ——, ——–——, 114 S.Ct. 771, 781–82, 127 L.Ed.2d 29 (1994). The interest here is monetary—and, unlike the circumstances of the welfare recipients in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), no one is at risk of starvation if the action precedes the hearing. Governments often take property and settle up years later; so too with breach of contract. When dealing with commercial contracts, no less than when dealing with claims to disability benefits, there is little "reason to depart from the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action." *Mathews v. Eldridge,* 424 U.S. 319, 343, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976).

Mid–American therefore loses this suit for two independent reasons: first, it does not seek due *process* but rather protests the substance of the City's action; second, a prior hearing is not essential to *due* process, and litigation after the fact provides an ample opportunity to test the validity of the City's interpretation and supply a remedy if the City has erred.

■ Our agreement with the district court on the merits sets up Gary's argument that it may not be penalized for contempt of court. Although the addressee of an injunction must comply even if the order was entered in error, see *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 439–40, 96 S.Ct. 2697, 2706–07, 49 L.Ed.2d 599 (1976), this collateral bar doctrine does not apply if the court lacks subject-matter jurisdiction. *United States Catholic Conference v. Abortion Rights Mobilization, Inc.,* 487 U.S. 72, 108 S.Ct. 2268, 101 L.Ed.2d 69 (1988); but cf. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 394–98, 110 S.Ct. 2447, 2455–57, 110 L.Ed.2d 359 (1990); *Willy v. Coastal Corp.,* 503 U.S. 131, 112 S.Ct. 1076, 117 L.Ed.2d 280 (1992). To say as the district court did that Mid–American lacks a property interest—or to say as we have that the opportunity to litigate in state court is all

the process "due" under the Constitution—is to say that the federal court lacks jurisdiction, Gary insists. Yet it is an old, old principle that the plaintiff's loss on the merits does not retroactively divest the court of jurisdiction. *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (citing many cases). Jurisdiction is established (or not) at the outset of a case. A claim purporting to rest on federal law comes within federal jurisdiction unless it is frivolous—and even claims that look frivolous to most judges may have enough substance to be dismissed on the merits rather than for lack of jurisdiction. See *Hagans v. Lavine,* 415 U.S. 528, 536–38, 94 S.Ct. 1372, 1378–80, 39 L.Ed.2d 577 (1974); *Crowley Cutlery Co. v. United States,* 849 F.2d 273 (7th Cir.1988). Mid–American's claim is not frivolous; the district judge thought well enough of it to issue a TRO, and in resolving the appeal we have had to explore some difficult territory. So there is federal jurisdiction, and the fact that Mid–American has lost does not relieve Gary (and its officials) of sanctions for disobedience to a lawful order. This *is* a lawful order; Gary's assertion that the order is too vague to be enforced does not require discussion. Gary must pay the fines for any noncompliance after November 4, 1994.

■ The fine for days before the court announced a schedule of sanctions presents a more difficult question. A penalty for completed disobedience is presumptively a criminal sanction. See *United Mine Workers v. Bagwell,* —— U.S. ——, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). The district judge did not afford defendants the protections associated with a criminal prosecution. What is more, the power to initiate a criminal prosecution for contempt of court is except in rare instances vested in the executive branch rather than a private party acting on behalf of the judiciary. *Young v. United States ex rel. Vuitton et Fils, S.A.,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987); *United States v. Vlahos,* 33 F.3d 758 (7th Cir.1994). This contempt proceeding was initiated and prosecuted by Mid–American, not by the United States, and the fine is therefore appropriate only to the extent it is compensato-

ry, and therefore a civil sanction. *Bagwell,* —— U.S. at ——, 114 S.Ct. at 2558.

■ The district court stated that it selected $25,000 a day as an estimate of Mid–American's damages, which would make the fine compensatory and the proceeding civil. But the court did not explain its calculations. It wrote:

> The Court arrived at this figure by examining the amount of money Mid–American Waste could have expected to earn each day (based on operations in the last six months) and deducting a certain percentage for expenses which Mid–American did not incur as a result of being ousted from the Gary Landfill.

This is the entire explanation, and we find it baffling. During the six months preceding the hearing, Mid–American had been depositing approximately 1,000 tons of waste per day. Mid–American charged its customers $21 per ton, so the total revenue lost was $21,000 a day. Even if Mid–American did not save a penny in expenses during the days of shut-down (hardly likely), the maximum compensatory fine would have been $21,000 per day. Mid–American says that it was entitled under the lease to deposit 2,000 tons daily, and that the City had acted wrongfully in imposing a 1,000 ton limit. Mid–American's position implies lost revenues of $42,000 a day (if customers actually tendered that much waste), but this is not the volume the district judge specified. We are also troubled by the reference to "a certain percentage for expenses". Which expenses?; what percentage, and why was it chosen? A judge reckoning a compensatory award must make subsidiary findings that permit the parties (and the court of appeals) to know the basis of the decision.

■ Gary tells us that a remand is unnecessary because the maximum compensatory award is zero. This is so, Gary says, because during the six months before Gary barred its access to the dump Mid–American was losing as much as $200,000 per month. On this understanding Gary was doing Mid–American a big favor by terminating the lease, and one wonders why the firm is fighting. The answer is that many of its costs are fixed— for example, the debt service on the improvements and rental obligations on buildings and equipment—and cannot be avoided by closing down. Suppose that during April through September 1994 Mid–American took in an average of $420,000 per month ($21,000 per day times 20 working days) and had expenses of $620,000 per month, as follows: $200,000 in debt service; $200,000 in rental and similar fixed components; and $220,000 in avoidable costs such as labor and consumables (gasoline, maintenance on the trucks, and the like). When operating the landfill under the City's 1,000 ton per day cap, Mid–American loses $200,000 per month. But when locked out of the landfill, the firm loses $400,000 per month. Its damages from breach would be the difference between these figures, or $200,000 per month ($10,000 per day)—higher if Gary should have let it deposit more than 1,000 tons a day. These are hypothetical figures; we have not gone through the record to calculate compensatory damages accurately, because this task belongs to the trier of fact. But the hypothetical shows why Gary's no-damages argument is wrong.

The case must be remanded so that the district court can determine, with more precision than it has so far, an appropriate compensatory award. Compensation to Mid–American is not the only objective. The district court found that Gary intentionally disobeyed an injunction and fabricated an excuse for that conduct. If that is an accurate description of things, criminal as well as civil sanctions are in order. The legal system has a vital interest in assuring compliance with lawful judicial orders and punishing those who defy them. We therefore will send a copy of this opinion to the United States Attorney for the Northern District of Indiana so that the Executive Branch may consider whether to initiate a criminal prosecution—not only for contempt of court but also for perjury (the district court's pretext finding implies that the testimony presented in the contempt hearing was intentionally false).

The judgment dismissing the suit with prejudice is affirmed. The fines for days following November 4, 1994, are affirmed. The fines for October 31 to November 4 are

vacated, and the case is remanded for proceedings consistent with this opinion.

B.H., C.H., J.E., et al.,