In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――

No. 05-1271

GREATER CHICAGO COMBINE AND CENTER, INC.,
an Illinois not-for-profit corporation,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

―――――――

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 5429—**Harry D. Leinenweber**, *Judge.*

―――――――

ARGUED OCTOBER 28, 2005—DECIDED DECEMBER 22, 2005

―――――――

Before EASTERBROOK, MANION, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* The City of Chicago enacted an ordinance that prohibited the keeping of pigeons in most residential areas of the city. An organization of homing pigeon keepers, known as the Greater Chicago Combine and Center, Inc., sued the city claiming that the ordinance violated the Fourteenth Amendment of the United States Constitution. The district court granted the city summary judgment. We affirm.

**I.**

In September 2003, Chicago's city council passed the "Restrictions on Pigeons" ordinance in response to citizen complaints about feathers, droppings, odor, and noise (cooing) generated by pigeons housed in residential areas (i.e., coops in homes, backyards, and garages). The council also enacted the ordinance due to public health concerns (e.g., disease).

Specifically, the ordinance, Chicago Municipal Code § 7-12-387, prohibits the keeping of pigeons within residential districts. Pursuant to § 387(b), it is "unlawful for any person to import, own, keep or otherwise possess any live pigeon within any area designated as a residence under the Chicago Zoning Ordinance" except for "transporting a live pigeon through a residential district, if the pigeon is caged during transport and not released in a residential district." In addition, § 387(c) makes it "unlawful for any person to construct or maintain any coop or cote that is, or may be used for the storage, maintenance or sheltering of any live pigeon within" the aforementioned residential areas. By its terms, the ordinance does not apply to non-residential areas, such as those zoned commercial or industrial.

Under § 387(e), violations of the ordinance are treated as a public nuisance. As such, violations are abated in accordance with the notice and other procedures set forth in Chicago Municipal Code § 7-28-010. Section 387(f) subjects violators to fines ranging from $100 to $1,000 or jail time up to six months per offense. Each day a violation continues is deemed a separate offense.

Prior to this ordinance, the city did not restrict the keeping of pigeons, and a number of city residents housed pigeons

on their property. Among those keeping pigeons were members of a non-profit organization called the Greater Chicago Combine and Center, Inc. ("GCCC"). According to GCCC, its members raise, train, and breed homing pigeons for educational purposes.

The anti-pigeon ordinance went into effect on January 1, 2004. At that time, the ordinance contained an exemption for educational, medical, scientific, and zoological purposes. Thus, under this exemption in § 387(d), a pigeon could be kept in a residential area if it were kept for one of the four enumerated purposes and if its owner obtained a license.

GCCC members in the city's residential areas seized on the educational exemption to continue their homing pigeon pursuits. Viewing this development as an unintended "loophole," the city council amended the exemption in May 2004. It replaced § 387(d)'s broad language exempting the four aforementioned purposes with narrower language exempting two specific sites: the Lincoln Park Zoo and the zoo at Indian Boundary Park. Other than those two zoos, pigeons could no longer be kept in residential areas for any purpose.

Later in that same month, the city council amended the ordinance a second time. This amendment exempted two of the city's fifty wards (the 32d and 47th wards) from the residential pigeon ban. The aldermen representing these two wards initiated this amendment. The record does not reveal the precise reason that these two particular wards were exempted, but presumably the aldermen were responding to pigeon-keeping constituents.

With the educational exemption repealed, GCCC members in residential areas of the other forty-eight wards no longer had a plausible means of keeping their pigeons and

simultaneously complying with the ordinance. Consequently, in August 2004, GCCC sued the city on behalf of its affected members. GCCC claimed that the ordinance violated its affected members' equal protection rights under the Fourteenth Amendment. The complaint specifically claimed that the ordinance "violates the equal protection clause because the classifications are disparate in that they allow certain residents to continue to harbor homing pigeons within the city of Chicago." The complaint also included a substantive due process claim under the Fourteenth Amendment as well as a supplemental state law claim.[1]

With the complaint, GCCC filed a motion for a preliminary injunction. Resting primarily on the two-ward exemption, the district court granted the motion in late August. The district court vacated the injunction in September on a procedural ground, but, at the district court's request, the city agreed to voluntarily refrain from enforcing the ordinance until the matter was resolved.

In apparent response to GCCC's equal protection claims, the city council passed another amendment in November, which repealed the two-ward exemption. Therefore, as of this most recent amendment to the ordinance,[2] all residential areas of the city (save for the two

---

[1] GCCC's only claim under state law was that the city, in passing the ordinance, exceeded its "home rule" power under the Illinois Constitution. *See City of Burbank v. Czaja*, 769 N.E.2d 1045, 1051 (Ill. App. Ct. 2002). As indicated below, GCCC does not pursue this claim on appeal.

[2] In its current form, the ordinance reads as follows:

Restrictions on pigeons. (a) For purposes of this section only
(continued...)

zoos) are equally subject to the pigeon-keeping ban. Non-residential areas remain ban-free.

------------------

(...continued)

the following definition applies: "Pigeon" means any live bird of the Family Columbidae.

(b) It shall be unlawful for any person to import, sell, own, keep or otherwise possess any live pigeon within any area designated as a residence district under the Chicago Zoning Ordinance. Nothing in this subsection prohibits any person from transporting a live pigeon through a residential district, if the pigeon is caged during transport and not released in a residential district.

(c) It shall be unlawful for any person to construct or maintain any coop or cote that is, or may be used for the storage, maintenance or sheltering of any live pigeon within any area designated as a residence district under the Chicago Zoning Ordinance.

(d) The provisions of subsections (b) and (c) of this section shall not apply to the keeping of pigeons as part of an exhibit at either Lincoln Park Zoo or the zoo at Indian Boundary Park.

(e) Violation of any portion of this section shall constitute a public nuisance, which may be abated pursuant to the procedures described in section 7-28-010. In addition to any fine or penalty, an amount equal to three times the cost or expense incurred by the city in abating a nuisance may be recovered in an appropriate action instituted by the corporation counsel.

(f) Any person who violates any provision of this section shall be fined not less than $100.00 nor more than $1,000.00 or may be incarcerated for a period not to exceed six months, or both. Each day that a violation continues shall constitute a separate and distinct offense.

Chicago Municipal Code § 7-12-387 (amend. Nov. 3, 2004).

Ultimately, the city moved for summary judgment. In December, the district court granted that motion, rejecting GCCC's federal and state claims. GCCC appeals, raising only its federal equal protection and substantive due process claims.

## II.

Before addressing GCCC's arguments on appeal, we turn to a jurisdictional matter raised at oral argument. GCCC brought this suit as a federal question case. One component of federal question jurisdiction is "substantiality." *Gammon v. GC Servs. Ltd. P'ship*, 27 F.3d 1254, 1256 (7th Cir. 1994); *Ricketts v. Midw. Nat'l Bank*, 874 F.2d 1177, 1180-81 (7th Cir. 1989). That is, for subject matter jurisdiction to exist in such a case, the face of the complaint must demonstrate that a claim under the Constitution or other laws of the United States is "sufficiently substantial." *Gammon*, 27 F.3d at 1256. As a result, if a federal claim is "immaterial to the true thrust of the complaint and thus made solely for the purpose of obtaining jurisdiction" or if the federal claim is " 'wholly insubstantial and frivolous, ' " *Ricketts*, 874 F.2d at 1182 (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)), then "the court does not have the power to decide the case" and must dismiss the complaint for lack of subject matter jurisdiction, *Gammon*, 27 F.3d at 1256.

Since substantiality is a jurisdictional matter, the assessment of whether a claim is insubstantial or frivolous is made as of the time the lawsuit was initiated. *See Hagans v. Lavin*, 415 U.S. 528, 538-39 (1974) ("[J]urisdiction, a matter for threshold determination, turned on whether the question was too insubstantial for consideration."); *Mid-Am. Waste*

*Sys. v. City of Gary*, 49 F.3d 286, 292 (7th Cir. 1995) ("Juris-diction is established (or not) at the outset of a case."); *Gammon*, 27 F.3d at 1256; *Ricketts*, 874 F.2d at 1180-82. At the outset of the present case, the city treated residents keeping pigeons in two wards of the city differently than residents keeping pigeons in the other wards of the city. GCCC based its equal protection claim in part on this two-ward exemp-tion, and the district court issued a preliminary injunction primarily because of this two-ward exemption. Again, the complaint specifically averred that the ordinance "violates the equal protection clause because the classifications are disparate in that they allow certain residents to continue to harbor homing pigeons within the city of Chicago." This equal protection claim is sufficiently plausible to secure subject matter jurisdiction for GCCC's entire complaint; we need not discuss the other constitutional allegations here. *See Rickets*, 874 F.2d at 1182 ("If there is any foundation of plausibility to the federal claim federal jurisdiction exists." (internal quotation omitted)); *cf. Mid-Am.*, 49 F.3d at 292 (district court's grant of a TRO was one reason supporting this court's determination that a claim was not frivolous for jurisdictional purposes). The fact that the city repealed the two-ward exemption does not change this jurisdic-tional inquiry. While the repeal diminished the strength of GCCC's equal protection claim, the repeal did not "retroactively divest the court of jurisdiction." *Mid-Am.*, 49 F.3d at 292. Satisfied that GCCC secured federal question jurisdiction at the outset and that we have the authority to adjudicate this case, we turn to the merits.

## III.

Our review of a district court's summary judgment decision is de novo. *See Civil Liberties for Urban Believers*

*v. City of Chicago*, 342 F.3d 752, 759 (7th Cir. 2003). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

We begin with the standard by which the ordinance should be reviewed, which is a matter the parties sharply dispute. The city maintains that GCCC's constitutional claims should be subject to rational basis review, which the district court applied. GCCC argues for a higher standard, which it refers to as the substantial relationship test.

GCCC's argument for something greater than rational basis review draws heavily from Illinois law. In other words, GCCC wants us to look to Illinois law to determine the proper standard of review for GCCC's *federal* constitutional claims. To justify this state law approach, GCCC declares in its appellate brief: "Judges in federal court cases involving land use issues are compelled to look to the law of the state of the property's situs for guidance." GCCC supports this proposition with a single case, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972). Unlike the present case, *Roth* was a procedural due process case, which dealt with the issue of whether a non-tenured professor had a property interest in continued employment with a state university (he did not). *Id.* at 569, 576-78. GCCC hangs its hat on the following passage from *Roth*: "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as

state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577. Here, however, we are not dealing with some abstract property rights claim. We do not have to decide, for instance, if GCCC's members have a property interest in their residences or their pigeons (they obviously do). *Roth* is therefore inapposite. While in a case like *Roth* it is practical to look to state law to see if a property interest exists, that principle does not extend, as GCCC would have it, to a state standard of review dictating a federal standard of review in federal court on a federal constitutional question.

GCCC also bases its argument for a substantial relationship test upon *Village of Euclid v. Ambler Realty Company*, 272 U.S. 365 (1926), and its progeny. *Euclid* ruled that for an ordinance to be held unconstitutional, the ordinance must be "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." 272 U.S. at 395. While *Euclid* employed the words "substantial relation," it also used the words "clearly arbitrary and unreasonable." Moreover, prior to this summarization passage, *Euclid* had already said that the ordinance did not go beyond "the bounds of reason and assume[ ] the character of a merely arbitrary fiat." *Id.* at 389 (internal quotation omitted). Also, *Euclid* had already explained that the ordinance passed constitutional muster because it "[bore] a rational relation to the health and safety of the community" and, at that point, *Euclid* listed several conceivable grounds for this rational relation. *Id.* at 391. Keying off the words "clearly arbitrary and unreasonable" as well as the other rational basis language in *Euclid*, our precedent has routinely applied *Euclid* as a rational basis rule for substantive due process and equal protection challenges to municipal ordinances. *See Pro-Eco, Inc. v. Bd.*

*of Comm'rs of Jay County*, 57 F.3d 505, 514 (7th Cir. 1995) ("We have interpreted 'arbitrary and unreasonable' to mean invidious or irrational." (citing *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir. 1988); *Burrell v. City of Kankakee*, 815 F.2d 1127, 1129 (7th Cir. 1987))); *see also Urban Believers*, 342 F.3d at 766; *Hager v. City of W. Peoria*, 84 F.3d 865, 872 (7th Cir. 1996); *Clark v. County of Winnebago*, 817 F.2d 407, 408-09 (7th Cir. 1987). Accordingly, GCCC is not entitled to a heightened, "substantial relationship" review.

With that, we turn to GCCC's substantive due process claim. To be successful, GCCC must "demonstrate either that the ordinance infringes a fundamental liberty interest or that the ordinance is 'arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' " *Pro-Eco*, 57 F.3d at 514 (quoting *Euclid*, 272 U.S. at 395; citation omitted). (As indicated above, the second alternative is a rational basis test.) The adjective "fundamental" in this setting is reserved for deeply-rooted, sacrosanct rights such as "the right of a man and woman to marry, and to bear and raise their children." *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 (7th Cir. 2000). Raising homing pigeons is an entirely different matter. It is not a fundamental right, as GCCC's acknowledges by its silence on this issue.

Thus reaching the second alternative of the inquiry, "governmental action passes the rational basis test if a sound reason may be hypothesized." *Pro-Eco*, 57 F.3d at 514 (internal quotation omitted); *see also Euclid*, 272 U.S. at 388 ("If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control."); *Clark*, 817 F.2d at 409. The city advances two reasons for its pigeon prohibition:

limiting interference with neighbors' enjoyment of their property and public health concerns. As the city's reasons are at least hypothetically rational justifications for banning pigeons in residential areas, they are enough for the city to survive this low level standard of review. While housing pigeons in rural areas, for example, may be a perfectly unobtrusive endeavor, it is at least conceivable that the feathers, droppings, odor, and noise generated by kept pigeons in tight, urban lots would be an untenable nuisance to residential neighbors. *See Euclid*, 272 U.S. at 387-88 ("A nuisance may be merely a right thing in the wrong place,—like a pig in the parlor instead of the barnyard."). It is also, at a minimum, plausible that feeding and maintaining pigeons in backyard coops would increase the public health risks posed by rodents and disease. *See Pro-Eco*, 57 F.3d at 514 ("Concern for public health is a sufficient reason on its face to pass the *Euclid* test."). Consequently, the city has a rational basis for its decision to ban the keeping of pigeons in residential areas, and GCCC's substantive due process claim is at an end.

GCCC's equal protection claim follows in much the same manner. *See, e.g.*, *Pro-Eco*, 57 F.3d at 514. GCCC does not claim that its members are part of a particularly "vulnerable group, racial or otherwise," *Hager*, 84 F.3d at 872, also known as a "suspect class[,] whose different treatment at the hands of the [city] would be subject to strict or intermediate scrutiny." *Pro-Eco*, 57 F.3d at 514. Therefore, "the same test of rationality we used for analysis of [the] substantive rights claim applies to its equal protection claim." *Id.* That is, "unless a statute classifies by race, alienage, or national origin or impinges on fundamental constitutional rights, the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate

state interest." *Urban Believers*, 342 F.3d at 766 (internal quotation omitted).

With the two-ward exemption repealed, the remaining disparate classifications resulting from the ordinance are residential versus non-residential and pigeons versus pets that can cause unpleasant or unhealthy conditions in a residential neighborhood. It is true that other animals make noise, leave droppings, and can be otherwise unsavory. Nonetheless, without delving into the distinctions between pigeons and dogs, for instance, we can put this issue to rest by simply acknowledging that a city's decision to address a problem gradually is rational. *See Vaden v. Village of Maywood*, 809 F.2d 361, 365 (7th Cir. 1987) ("A local ordinance aimed at remedying a problem need not entirely eliminate the problem. Instead, reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." (internal quotation omitted)). Similarly, a satisfactory reason for the residential-only ban, as the district court pointed out, is the reasonable belief that the need to protect the public against the nuisance and adverse health concerns generated by pigeons is attenuated in predominately commercial areas (even though some people may live in such areas) but warrants greater or immediate attention in residential areas (where people predominately live). For these reasons, GCCC cannot show that it is "wholly impossible" to relate this governmental action to legitimate governmental objectives, and, as a result, we cannot disturb the ordinance under the equal protection clause. *Urban Believers*, 342 F.3d at 766 (internal quotation omitted); *see also Hager*, 84 F.3d at 872; *Pro-Eco*, 57 F.3d at 514.

**IV.**

We are not unsympathetic to the GCCC members affected by this restriction on how they use their property. At the same time, we understand the concerns of their neighbors. Balancing these competing interests, however, is not our role. Under the governing rational basis standard of review, federal courts do not review the wisdom or desirability of fairly debatable legislative choices. *See Heller v. Doe*, 509 U.S. 312, 319 (1993); *Euclid*, 272 U.S. at 388. Accordingly, GCCC is not entitled to relief on its substantive due process or equal protection claim. The judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*