PAUL G. HAMEL & another[1] vs. BOARD OF HEALTH OF
EDGARTOWN.

No. 95-P-776.

Bristol. March 28, 1996. - May 13, 1996.

Present: PERRETTA, KASS, & JACOBS, JJ.

*Water. Health, Board of. Regulation. Municipal Corporations,* Board of
health, Regulations, Water supply.

Promulgation of a health regulation forbidding the construction of new
guesthouses in a certain area of a town was a valid and reasonable
exercise of authority under G. L. c. 111, § 31, by a municipal board of
health, where the prohibition was rationally related to the control of
wastewater flow which would protect the local aquifer and aid the main-
tenance of safe drinking water. [422-424]


CIVIL ACTION commenced in the Superior Court Depart-
ment on January 29, 1993.

The case was heard by *Richard J. Chin*, J., on motions for
summary judgment.

*Michael Franco* for the plaintiffs.

*Ronald H. Rappaport* for the defendant.

KASS, J. As part of a plan to protect the drinking water
supply of the Katama section of Edgartown from contamina-
tion, that town's board of health (board), acting under author-
ity conferred by G. L. c. 111, § 31, adopted a regulation
prohibiting the construction of guesthouses in the affected
area. Paul G. Hamel and Carolyn Hamel own a four-bedroom
house located on a two-acre lot that is subject to the board's
regulation. They wish to construct a two-bedroom guesthouse
with its own septic system and brought a complaint in
Superior Court for a declaration that the "no guesthouses"
regulation was a usurpation by the board of zoning power

_____

[1]Carolyn Hamel

vested by G. L. c. 40A exclusively in the inhabitants of the town. A judge of that court, who heard the question on the Hamels' motion for summary judgment, ruled that the "no guesthouses" regulation was related to the health needs of the town and was, therefore, a lawful exercise of the board's authority under G. L. c. 111, § 31.[2] We affirm.

Disquieting levels of nitrates, ammonia, and saltwater had been detected in private drinking water wells in Edgartown, causing the board in December, 1982, to take two steps: *first*, to impose a moratorium on development in the Katama section[3] of Edgartown[4]; and, *second*, to commission a hydrological study of the Katama aquifer by a firm of consulting engineers and hydrogeologists.

Phase one of the study assessed existing groundwater data for the entire town. A second phase focused on the Katama area. The consultant prepared a groundwater contour map, undertook additional water quality sampling, developed a model of nitrate levels in eastern Katama, and made preliminary recommendations. A final and third phase of the study furnished more detailed data and made recommendations for regulations for groundwater protection in Katama, in particular, and in Edgartown more generally. The study included models which predicted nitrate concentrations (this was the pollutant of concern) in groundwater under a) then current development; b) saturation development *without* regulations in place; and c) saturation development *with* regulation. Among other factors, the consultant considered the total acreage in the Katama area; the number of lots already built upon; the quantity of buildable land and open space; the

[2]The final judgment that was entered and was appealed from dismissed the complaint. When acting on a complaint for a declaratory judgment, a judge should not dismiss the complaint, even when the question is tested by a motion for summary judgment, but should declare the rights of the parties, e.g., in this case, that the board's regulation was valid and enforceable. *146 Dundas Corp.* v. *Chemical Bank*, 400 Mass. 588, 589 n.4 (1987). *Whitehouse* v. *Sherborn*, 11 Mass. App. Ct. 668, 676 (1981). Here, the judge's declaration of the rights of the parties was articulated in his memorandum of decision and order on the plaintiffs' motion for summary judgment.

[3]The Katama section of Edgartown is bounded by the Atlantic Ocean, Edgartown Great Pond, Katama Bay, and Mattakeset Bay. The soils in the area are typically porous and the water table is low.

[4]As to the circumstances in which a municipality may lawfully impose a moratorium on construction, see *Collura* v. *Arlington*, 367 Mass. 881, 886-888 (1975).

number of potential buildable lots, houses, guesthouses, condominiums, hotels and motels permitted by zoning; the nitrate concentrations in rainfall and septic tank effluent; annual recharge capacity of the aquifer; the average daily wastewater flow to each septic tank per person; the State average for the number of people per residence (the number was three); and the degree of nitrate dilution in the total volume of groundwater.

Predictably, the consultant reported a connection between nitrate concentrations in groundwater and development density. In Katama, the report recommended the adoption of a standard of one bedroom per 10,000 square feet of lot area; sewage flow not to exceed 110 gallons per day per 10,000 square feet of lot area; a requirement that septic systems not be designed with capacity for more than four bedrooms; a four-bedroom limit for new houses; and a prohibition on guesthouses and multifamily dwellings. Such restrictions, the engineers advised the board, would have an ameliorating effect on groundwater contamination by nitrates.

A version of the groundwater protection regulations was first adopted in 1985, and a later version was codified by the board in 1991. It reads as follows:

> "1.2.33: Katama Area: For dwelling and non-dwelling uses the sewage flow will not exceed 110 gallons per day per 10,000 square feet of lot area. Septic systems will not be designed or installed to exceed a capacity of greater than four (4) bedrooms. No new guesthouses or multifamily dwellings are permitted."

It is the last sentence at which the Hamels have taken aim. To be sure, a provision that dictates whether certain kinds of uses may be located in a certain area has the ring of a zoning regulation; zoning ordinances or by-laws govern "the use of land and the size, location and use of buildings." *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 636 (1970). To some degree, however, different sources of land use control — zoning, planning, environmental controls, health regulations — overlap. So, for example, a zoning ordinance may, in certain circumstances, require a sewer connection, because zoning codes, too, treat with health issues. *Decoulos* v. *Peabody*, 360 Mass. 428, 431 (1971). Environmental regulations,

to the end of securing clean water, dictate where structures may be built. Planning boards, through their power to approve road, sanitation, and drainage systems indirectly influence the use of land within the area of a subdivision. Reciprocally, the regulations that a board of health adopts under G. L. c. 111, § 31, may deal with land use if there is a solid connection between the use and a health related issue.

Under § 31, as amended by St. 1985, c. 70, "[b]oards of health may make reasonable health regulations." That language confers plenary power to promulgate health regulations — reasonable ones — that are general in application. *Druzik* v. *Board of Health of Haverhill*, 324 Mass. 129, 133 (1949). *United Reis Homes, Inc.* v. *Planning Bd. of Natick*, 359 Mass. 621, 623 (1971). *Independence Park, Inc.* v. *Board of Health of Barnstable*, 403 Mass. 477, 480 (1988). When undergoing judicial testing for reasonableness, a board of health regulation enjoys the status of a statute, i.e., the court makes all rational presumptions in favor of the validity of the enactment. Only when there is no rational connection between the regulation and the public purpose to be achieved will a court strike it down. *Druzik* v. *Board of Health of Haverhill, supra* at 138-139.

Measured by that standard, the board's prohibition of the construction of new guesthouses in Katama was solidly connected to the maintenance of safe drinking water in the geographical area concerned. The consulting engineer's report, which the board adopted as a factual basis for action, contained findings that a single-family residence, as matter of average, was used by three persons, irrespective of the number of bedrooms in the house. In the case of another family unit within a house (as in the case of a two-family house) or of a guesthouse, that unit would, in average expectancy, be used by three persons, thus, doubling the usage and sewage production of the lot. The reason for expected intense uses of guesthouses, based on the engineers' study of existing use, is that they are often rented to summer vacationers, who occupy them to the hilt. Even if reserved for private guests, there was a pattern of past and expected future use of guesthouses that was heavier than the use of spare bedrooms in a single occupancy house, the heavier use of guesthouses stemming from the greater privacy that could be reserved by the host and accorded to the guest in the guesthouse setting.

Although the regulations included limits on wastewater flow, to rely solely on monitoring outflow created problems of enforcement and the embarrassment of interdicting the use of living facilities already built and occupied. It was reasonable for the board to anticipate the problem and to make rules that would diminish the per person use of lots, thereby producing one of several devices that held out promise for reversing the deterioration in the water supply. In urging the unreasonableness of the regulation, the Hamels argue that a house and a guesthouse on a five-acre site have no more potential to produce wastewater flow than two houses, each located on a two and one-half acre lot. Owners of large lots are, therefore, unfairly discriminated against. The board could, however, consider the pattern of use and lot size in Katama and that there were a fair number of estates which, by the preference of the owners, were large in size. The board might then consider, as it appears it did, that the owners of the large estates would rather abandon a guesthouse construction project than split up their properties.

Consistently, the board's regulatory measures in question were related to the control of wastewater flow in the face of declining purity in water wells in Katama. Insofar as those regulations touched on land use, that impact was a byproduct of the primary purpose of limiting wastewater flow. In sum, the regulation forbidding the construction of new guesthouses is rationally related to its purpose, reasonable, and, therefore, validly adopted by the board.

*Judgment affirmed.*