McCann, J.
INTRODUCTION
Counsel for plaintiffs — Gaiy S. Brackett, Esq. and M. Yvonne Gonzalez, Esq.
Counsel for the defendant — Gregg J. Corbo, Esq.
The complaint is in the following two counts: Count I, Declaratory Relief; Count II, Injunctive Relief.
This matter came before the Court on an application for a Temporary Restraining Order and Preliminary Injunction. It became apparent to the Court upon reading the papers that the facts were not in dispute. Counsel were invited to submit the matter to the Court for final determination on the pleadings. Counsel were given the opportunity to consult with their respective clients which they did. The parties and counsel agreed to submit final determination of the facts on the pleadings,[1] the memoranda and other exhibits which had been agreed to. The Court allowed for oral argument on the submissions and the parties were given the opportunity for oral argument. Consequently, this Court therefore makes the following findings of fact and rulings of law.
FINDINGS OF FACT AND RULINGS OF LAW
The Town of West Boylston (“West Boylston”) is located on the western side of Wachusett Reservoir. The reservoir supplies water to the greater Boston area through the Massachusetts Water Resources Authority (MWRA).
All of the Plaintiffs own residences or residential units in West Boylston which are serviced by functioning subsurface disposal systems, more commonly referred to as septic systems.
The Board of Selectmen is an elected board of West Boylston. The Selectmen act as the Board of Sewer Commissioners (“Commissioners”).
The Selectmen approve all appointments of the Town Administrator. The Town Administrator appoints the Board of Health. The Selectmen approve the appointment of the members of the Board of Health.
The Metropolitan District Commission (MDC) is responsible for the management and maintenance of a system of watersheds and reservoirs in Massachusetts, including the Wachusett Reservoir, which supplies potable water to the MWRA.
*20 In 1990, the MDC published a “Sanitary Survey” of the Southern Wachusett Sanitary District, which includes West Boylston (“1990 MDC Study”).
The 1990 MDC Study concluded that chemical laden stormwater runoff from roads, parking lots, and lawns and increased soil erosion in the towns of Holden and West Boylston are the principal factors contributing to local pollution of the Wachusett Reservoir. In addition, the 1990 MDC study concluded, based on available water quality data, that inadequately renovated wastewater discharged from unsuitable and nonfunctional on-site disposal systems also degraded the water quality. The study warned that the urban runoff may still be a significant source of pollution, even in the absence of on-site wastewater disposal systems.
The 1990 MDC Study recommended a plan that would include both sewer and non-sewer approaches to remediation of septic system problems but cautioned that any such plan must recognize that the watershed is the source of the water used by local residents and that any sewer alternative will invariably result in an out-of-basin transfer of water for treatment and disposal. This impact would have significant ramifications for the watershed system from a water quantity perspective.
In December 1994, the engineering firm of Weston & Sampson published a “Wastewater Facilities Plan for West Boylston-Holden-Wachusett Reservoir Watershed,” which it prepared at the direction of the MDC (“1994 Sewer Plan Report”).
The 1994 Sewer Plan Report acknowledged that the 1990 and 1991 sanitary surveys conducted by the MDC identified significant water quality problems in the tributary brooks to the reservoir. These water quality problems were directly related to stormwater runoff from developed and agricultural areas and the inadequate treatment of wastewater from on-site septic systems.
The stated purpose of the 1994 Sewer Plan Report was to develop a wastewater facility plan for Holden and West Boylston. The objective of the wastewater facility plan is to protect and preserve, to the maximum extent possible, the water quality in the watersheds and reservoirs under MDC jurisdiction.
In order to achieve the objectives of the study that culminated in the 1994 Sewer Plan Report, the authors of the study made two assumptions, which assumptions were based on the previous MDC surveys and the joint MDC-MWRA watershed protection plan. These two assumptions were:
(1) A wastewater facility plan must be completed to determine areas to be sewered and areas to continue using on-site subsurface wastewater disposal systems.
(2) On-site systems, if properly designed, sited, constructed and maintained, provide adequate protection to water quality and public health and may be utilized on a long-term basis within the study area.
The 1994 Sewer Plan Report proposed a phased-in sewer service to areas of West Boylston and concluded that several presently unsewered areas within West Boylston and Holden require sanitary sewer service to protect the Wachusett Reservoir from contamination due to failing and substandard subsurface wastewater disposal systems. These areas do not presently meet current Title 5 and local Board of Health requirements and cannot conform to the minimum requirements for on-site disposal wastewater.
The 1994 Sewer Plan projected that the cost for the construction of sewers in West Boylston would be almost 25 million dollars ($24,707,000) and estimated the annual operation and maintenance cost would be over one million dollars ($1,185,700).
In 1997, the Central Massachusetts Regional Planning Commission (“CMRPC”) conducted a study, which concluded that a principal contribution of pollution to the Wachusett Reservoir was the chemical laden stormwater runoff from roads, parking lots, and lawns, with the concomitant increased soil erosion (“1994 CMRPC Report”).
The 1997 CMRPC Report indicated that the installation of a sewer system would increase development in West Boylston, thereby exacerbating the stormwater runoff problem.
The Principal Planner of CMRPC, in a 1997 memorandum to the West Boylston Ad Hoc Committee, repeated his understanding that West Boylston “would like to adjust its zoning so as to encourage additional commercial development . . . [and] in contrast to Holden, West Boylston has a better chance of attracting noticeable additional residential development as a result of the MDC sewers.”
At Town Meetings in October 1995, May 1997, and October 1997, the residents of West Boylston voted to borrow almost 12 million dollars ($11,668,000), assess betterments, establish a mechanism for collecting unpaid sewer use fees, establish a Board of Sewer Commissioners and offer low interest loans for the upgrade of septic systems and sewer connections.
In an opinion letter dated November 12,2001, Town Counsel responded to a request for a legal opinion from John McMahon, a consultant to West Boylston with respect to the wastewater project.
The November 2001 legal opinion letter indicated that Mr. McMahon had asked for a review of proposed sewer connection policies and “whether these policies must be adopted by by-law, or whether the Board of Selectmen, acting as sewer commissioners, may adopt these policies as regulations or guidelines.” Town Counsel responded that “the Board of Health has the power to require a particular building to be connected to the sewer system if the subsurface sewage disposal *21 system serving the property has failed and the owner cannot upgrade the system in compliance with Title 5 . . . the Town may enact a by-law requiring all or a certain category of properties ... to connect to the sewer.”
The November 2001 legal opinion letter reflected that Mr. McMahon had asked if there was a Massachusetts law or regulation that authorizes a municipality to require connection to the sewer system if the financial viability of a sewer system is imperiled. Town Counsel responded that there was no such law or regulation, but the financial viability of the sewer system would be a valid reason for the Town, “acting by its Town Meeting, [to] enact a by-law requiring all or a certain category of properties to be connected.”
The November 2001 legal opinion letter reviewed the draft sewer connection policies as requested by Mr. McMahon. Town Counsel responded that the Town could adopt a by-law that would require all properly owners to connect to the sewer system unless the owner could demonstrate the existence of a compliant Title 5 septic system or that certain criteria have been met.
On May 20, 2002, at an Annual Town Meeting, the residents of the Town voted to defeat the adoption of a by-law that would require all residents to connect to the sewer system being constructed.
On June 1, 2002, the Selectmen met with the Superintendent of Sewers and Drains, John K. Westerling, the Town Accountant and Project Finance Director, Gary D. Suter, and the president of The Abrahams Group, Mark D. Abrahams, a consultant to the Town for the Sewer Enterprise.
During the June 1, 2002 meeting, the Selectmen discussed the failing financial health of the sewer system, which is commonly referred to as the “Sewer Enterprise.”
During the June 1, 2002 meeting, the Selectmen discussed writing a regulation for the Board of Health to adopt that would require each resident to connect to the sewer system. The minutes from that meeting reflect at least one Selectman voicing the reason that “the law says that the Board of Health does not have to have a reason to make you connect.”
During the June 1, 2002 meeting the Selectmen voted to require the Board of Health to attend the June 12, 2002, meeting of the Sewer Commissioners.
On June 5, 2002, the Board of Selectmen held a regularly scheduled public meeting. At that meeting, Selectman LeBlanc stated that the Selectmen “would like to proceed in some fashion to ensure that the Sewer Enterprise will work” but that the Selectmen “have concerns that the Board of Health is going askew.”
At the June 5, 2002 meeting, the Selectmen voted to request Town Counsel to write “a letter to the Board of Health with a proposed connection regulation to be adopted by the Board of Health and to send the letter to each member prior to their meeting.”
A letter, dated June 11, 2002, from Town Counsel was sent by facsimile to the Board of Health. Attached to this letter was a draft regulation, “which mirrors the bylaw which was proposed to Town Meeting,” for consideration by the Board of Health. In that letter, Town Counsel stated that he had “been requested by the Board of Selectmen to assist the Board of Health in drafting a regulation for the Board establishing mandatory connections to the Town’s sewer system.”
In the June 11, 2002 legal opinion letter, Town Counsel stated that, although he was of the opinion that the Board of Health had the authority to enact a mandatory sewer connection regulation, “despite the fact that Town Meeting voted not to enact a similar bylaw, . . . any regulation adopted by the Board of Health must relate to a legitimate public health and safety concern” and “should identify in the regulation itself the public health and safety reasons for such a regulation.”
The Board of Health attended the June 12, 2002 meeting of the Selectmen, who were meeting as the Board of Sewer Commissioners.
At the June 12, 2002 Board of Sewer Commissioners meeting, Selectman Stevens stated that the Town could not “get any rate relief until we have 100% connection so we need to enforce the laws of the Commonwealth that are on the books.”
At the June 12, 2002 Board of Sewer Commissioners meeting, Selectman LeBlanc admonished the Board of Health “that the sewer commissioners cannot establish the regulation or we would have done it by now, and that the BOH [Board of Health] might bear some flack from the public but that a public hearing is necessary.”
At the June 12, 2002 Board of Sewer Commissioners meeting, the Selectmen voted to hold a public hearing on increasing sewer rates and start-up betterments to help with the financial crisis of the “Sewer Enterprise.”
On June 19, 2002 the Board of Health convened a special meeting to discuss the mandatoiy sewer connection regulation, which had been created by Town Counsel at the request of the Selectmen and, at the direction of the Selectmen, provided to individual members of the Board of Health before the June 19, 2002 special meeting.
At the June 19, 2002 Board of Health special meeting, Town Counsel advised the Board that the Sewer Use Agreement between the Town and the Metropolitan District Commission (hereinafter “MDC”) did not compel the Board of Health to adopt a mandatory sewer connection regulation. In addition, Town Counsel strongly admonished the Board of Health that it must ascertain whether a “mandatoiy connection is *22 appropriate to protect the watershed and the public safety.”
Attached to a letter, dated July 1, 2002, to the Chair of the Board of Health from John Westerling, Superintendent of Sewers and Drains, were excerpts from two reports provided by the MDC: the “Watershed Protection Plan Update,” by Camp Dresser & McKee, Inc., dated July 31, 1998, and the “Environmental Quality Assessment Report, Reservoir District, 2002" by the Environmental Quality Section of the MDC.
In his letter, Mr. Westerling quoted from the above-mentioned reports and, before the quotes, summarized that “(t]he following quotations speak to the potential pollution of groundwater from improperly operating septic systems and the need to connect to a public sewer system to help clean drinking water supplies.” As his first quote, from the Watershed Protection Plan Update, Mr. Westerling repeated that “(p)roperly functioning on-site systems should not cause bacterial contamination of groundwater. . .’’As his first quote from the Environmental Quality Assessment Report, Mr. Westerling repeated that “(a]n on-site system that is functioning properly should not cause contamination of groundwater or surface waters ...”
On July 10, 2002, at a public meeting the Board of Health voted to accept the mandatoiy sewer connection regulation, which had been created by Town Counsel at the direction of the Selectmen and provided to the Board of Health at the direction of the Selectmen.
On August 28, 2002, the Board of Health held a public hearing on the mandatoiy sewer connection regulation. At this meeting, none of the thirty-four residents spoke in favor of the regulation and the minutes reflect that the Board of Health was there to hear comments only and not to answer any questions.
At the August 28,2002 hearing, the Board of Health did not express any basis for the proposed mandatoiy sewer connection regulation.
At the August 28,2002 hearing, the Board of Health did not state or otherwise indicate the title or summary of any study upon which it was relying in determining whether a mandatoiy sewer connection regulation was necessary for the purpose of protecting public health and safely.
At the August 28,2002 hearing, the Board of Health did not indicate that it had in its files studies of the watershed upon which it was basing its determination that a mandatoiy sewer connection regulation was necessary to protect the public health and safety, nor did the Board of Health offer that such studies could be examined by the public.
At a public meeting on September 25, 2002, the Board of Health adopted a mandatory sewer connection regulation. This regulation became effective on Januaiy 2, 2003. The Board of Health did not make any findings that the regulation was necessary to protect the public health and safely.
The mandatory sewer connection regulation states that the regulation was “enacted for protection of the public health, safety, welfare and environment and for the further purpose of ensuring the protection of the Wachusett Reservoir, a public water supply.” The regulation contains no subsidiary findings supporting that conclusion.
The mandatoiy sewer connection regulation requires the owners of all “houses, buildings or properties used for human occupancy, employment or recreation or in any way generating wastewater flows” in the Town to connect to the public sewer line “within one year from the date of the official mailed notice of sewer service availability ...” The regulation makes no distinction between owners of property with fully functional on-site disposal systems and those property owners whose on-site systems may be unsuitable and non-functional.
The mandatoiy sewer connection regulation, at Section 2.c, only gives the Board of Health authority to defer the deadlines in case of a hardship; the regulation does not authorize the Board of Health to grant a variance for any reason, or even for the limited reason that a landowner could demonstrate the existence of a compliant Title 5 septic system.
The mandatoiy sewer connection regulation, at Section 2.d, requires that “(a]ll costs and expenses associated with the installation and connection of the building sewer shall be the sole responsibility of the property owner, and shall be governed by the Town of West Boylston Sewer Connection Regulations.” The sewer connection regulations of the Town provide that the properly owner shall indemnify the Town of West Boylston from any loss or damage that may directly or indirectly be occasioned by the installation of the building sewer.
On or about December 20, 2002, the Board of Health mailed the official notice of sewer service availability and the mandatoiy sewer connection to affected residents.
The Board of Health maintains that “(n]one of the individuals that were sent notices of sewer availability have requested a deferment.”
In Februaiy 2002, Plaintiff Carolyn Padden requested a deferment from the mandatoiy sewer connection regulations. The Board of Health denied this deferment request in a letter dated March 27, 2003.
On June 9, 2003, at a Special Town Meeting, the residents of West Boylston voted to “demand that the Board of Health’s decision to require all homeowners in West Boylston to hook up to Municipal Sewerage be hereby rescinded, revoked and the decision of the Town Meeting body be binding upon all affected citizens of the Town of West Boylston.”
*23 Since September 25, 2002, the date the Board of Health adopted the regulation, the Selectmen have not presented a proposed warrant article to the West Boylston Town Meeting for the enactment of a by-law requiring mandatory sewer connections.
Since September 25, 2002, the Board of Health has not convened a public hearing to make findings of fact in support of the mandatory sewer connection.
RULINGS OF LAW
Under Mass. Gen. Laws, c. 40, §21, a town may enact by-laws for the purposes stated in Section 21 that the residents “may judge most conducive to their welfare” and, if appropriate, set monetary penalties for violations of the by-law.
Mass. Gen. Laws, c. 40, §21, clause 6, provides that the regulation of the use of and connections to a public sanitary sewer system are purposes for which a town may adopt a by-law.
By sufficient vote at a Town Meeting, under Mass. Gen. Laws, c. 40, §21, cl. (6), a town could adopt or reject a by-law that requires all owners of property or owners of certain categories of property that abut a public sanitary sewer to connect to that sewer. See Town of Uxbridge v. Travers, 19 Mass.App.Ct. 951 (1985). See also Decoulos v. City of Peabody, 360 Mass. 428, 429 (1971).
The West Boylston Town Meeting, in May 2002, voted not to adopt the by-law, proposed by the Board of Selectmen, that would have mandated connections to the public sewer system. Mass. Gen. Laws, c. 111, §31, authorizes boards of health to make “reasonable health regulations.”
In addition to this general regulatory enabling statute, the Legislature authorizes Boards of Health to enact reasonable regulations for the public health and safety relative to specific areas. In this regard, boards of health “may make and enforce regulations for the public health and safety relative to house drainage and connection with common sewers, if such a sewer abuts the estate to be drained.” G.L.c. 111, §127. Other examples of authority to promulgate regulations for the public health include regulating nuisances and foodstuff. G.L.c. 111, §122; c. 94, §146.
Under the clear language and statutory scheme of the General Laws, regulations of the boards of health must have an established public health purpose, otherwise the regulation is not a reasonable health regulation and, thus, is not authorized. Hamel v. Board of Health of Edgartown, 40 Mass.App.Ct. 420, 422-23 (1996).
Where there is no rational connection between all or part of a board of health regulation and public health, such gap “transcends the authority conferred upon the board of health by the statute, and that part of the regulation is void.” Commonwealth v. Rivkin, 329 Mass. 586, 589 (1952) (finding that c.94, §146, did not confer authority upon the board to prohibit sale of food on public streets). See also Druzik v. Board of Health of Haverhill 324 Mass. 129, 138-39 (1949).
In addition to regulating areas for the public health, boards of health may issue orders for the protection of public health. Mass. Gen. Laws, c. 83, §11 permits a board of health to “require” a properly owner whose land abuts a public or private way in which a common sewer has been laid to connect to the available sewer extension. This exercise of authority can be accomplished by the issuance of an enforcement order by the Board of Health.
Where the board of health requires a homeowner to connect to the sewer pursuant to Mass. Gen. Laws, c. 83, §11, such enforcement order must be based on public health. Fluharty v. Board of Selectmen of Hardwick, 382 Mass. 14, 17 (1980) (“[I]n the absence of an appropriate health and safely measure requiring a sewer connection, . . . [Massachusetts courts] seem to have assumed that the use of the common sewer is a matter for decision by the owner”).
The ban on septic systems, without regard as to whether the individual septic system was contributing pollution to the watershed groundwater, the tributaries to the Wachusett Reservoir, or to the Reservoir itself, is not solidly connected to the public health purpose declared by the Board of Health, in the mandatory connection regulation, as the protection of the public health, safety, welfare and environment and for the further propose of ensuring the protection of the Wachusett Reservoir, a public water supply.
Mass. Gen. Laws, c. 21A, §13 requires the Department of Environmental Protection (“DEP”) to promulgate regulations as the State Environmental Code (“Code”). Pursuant to “Title 5" of the Code, the DEP sets the "Standard Requirements for the Siting, Construction, Inspection, Upgrade, and Expansion of On-Site Sewage Treatment and Disposal Systems ..." The DEP publishes the Title 5 State Environmental Code at 310 CMR 15.000 (1995).
Title 5 states that the purpose of setting standards for on-site sewage disposal systems is to “provide for the protection of public health, safety, welfare and the environment.” 310 CMR 15.001(1).
Section 15.003 of Title 5 provides:
In general, full compliance with the provisions of 310 CMR 15.000 is presumed by the Department [of Environmental Protection] to be protective of the public health, safety, welfare and the environment
In addition, Section 15.003 offers a caveat that “specific site or design conditions may require "that additional criteria be met." These additional criteria are part of Title 5 and, to be in total compliance with Title 5 (not just a “maximum feasible compliance” under §15.303), the standards and limits for percolation through all soil types (§§15.101, 103, 104), hydrogeology (§15.107), nitrogen loading (§15.214), *24 and effluent loading (§15.242), to list a few, must be met. See also, §15.288, Certification of Alternative Systems.
Title 5 admonishes that it should be read together with Mass. Gen. Laws, c. 111, §31, 127; c. 83, §11; and c. 131, §40, the Wetlands Protection Act (“Act”); 310 CMR 15.001(4).
The DEP wetlands regulations, promulgated under authority of the Act, are published at 310 CMR 10.00. Section 10.03(3) sets a presumption of environmental protection where a septic system is to be constructed in compliance with the requirements of Title 5, and will meet certain siting requirements in relation to certain types of wetlands. Under Section 10.03(3), the wetland interests that are presumed protected include the prevention of pollution, protection of groundwater supply, protection of public and private water supplies, and storm damage prevention. See 310 CMR 10.01(2).
When addressing a challenge to the validity of a regulation, the court will “apply all rational presumptions in favor of the validity of the administrative action and not declare it void until its provisions cannot, by any reasonable construction, be interpreted in harmony with the legislative mandate.” Borden, Inc. v. Commissioner of Public Health, 388 Mass. 707, 723 (1983), quoting Consolidated Cigar Corp. v. Department of Public Health, 372 Mass. 844, 855 (1977).
The West Boylston Board of Health regulation that mandates all property owners connect to the available sewer extensions does not per se “protect public health and safety.” Cf. Borden, Inc. v. Commission of Public Health, 358 Mass. 707, 725 (1981) (finding that since formaldehyde meets the definition of hazardous substance, the substance was properly regulated under G.L.c. 94B).
The West Boylston Board of Health regulation that mandates that all property owners connect to the available sewer extensions is not rationally related to public health where studies of the watershed did not identify septic systems that were in compliance with Title 5 as creating public health or safety concerns and where the same studies found that the resulting inter-basin transfer of water as the result of sufficient mandatory connection to the sewer system would be extremely detrimental to public health and the environment. Accord Hamel v. Board of Health of Edgartown, 40 Mass.App.Ct. 420 (1996).
Although a court will not substitute its judgment for that of the board of health where the question of whether the promulgated regulation is reasonably related to public health purposes is “fairly debatable,” Druzik v. Board of Health of Haverhill, supra, 139, the facts clearly demonstrate that the regulation requiring all homeowners to abandon Title-5 compliant septic systems has no relation to public health:
Further supporting the Plaintiffs’ argument that the mandatory sewer connection regulation lacks sufficient connection to public health is the clearly documented financial impetus for the regulation. The Board of Health adopted the mandatory sewer connection regulation not because of the public health necessity of having everyone connect, but at the direction of the Board of Selectmen to enable the financing of the very costly West Boylston sewer system, immediately after the residents rejected a mandatory connection at the May 2002 Town Meeting. Then, subsequent to the enactment of the Bylaw, on June 9, 2003, at aSpecial Town Meeting, the voters voted to demand that the notice of the Board of Health requiring mandatory hookup be revoked.
By requiring all properties, within an area serviced by the sewer system, to connect to the system without regard to whether such properties can show full compliance with Title 5, which compliance, according to the DEP, sets a presumption of protecting public heath and the environment, the Court finds and rules that the Board of Health has promulgated an unreasonable regulation which is not related appropriately to public heath or safety.
This Court rules that the present mandatory sewer connection regulation of the West Boylston Board of Health is void: (1) as it was not validly adopted by the West Boylston Town Meeting as a bylaw in accordance with Mass. Gen. Laws c. 40, §21 (6); (2) as it is not related appropriately to public health or safety as shown by the record of the proceedings before the Board of Health in adopting the regulation; and (3) as it is not related to public health and safety as shown by the evidence presented by the parties in the trial of this matter.
This Court rules that the Board of Health lacked the authority to promulgate the present mandatory sewer connection regulation as it did. That regulation is therefore found to be invalid and void and of no effect.
ORDER
The Town of West Boylston, by and through its Board of Selectmen acting as the Board of Sewer Commissioners, and the Town of West Boylston Board of Health lacked the authority to promulgate the present mandatory sewer connection regulation for the Town of West Boylston which this Court declares to be invalid and void and of no force or effect.
A Permanent Injunction shall issue enjoining the defendant Board of Health to cease from enforcing its present mandatory sewer connection regulation. This shall not preclude the Board of Health from taking appropriate action against any party who is unable to demonstrate the existence of a compliant Title 5 septic system.
Judgment shall so enter for the plaintiffs.

 The defendants never filed an Answer because this matter was before the Court only on an application for a Temporary Restraining Order and a Preliminary Injunction. This Court construes the opposition to the Temporary Restraining Order and Preliminary Injunction as a general denial of the substantive issues raised by the allegations of the plaintiffs’ complaint.