RYO Cigar Association, Inc., & another[1] vs. Boston
Public Health Commission.

No. 09-P-1619.

Suffolk. May 12, 2010. - July 26, 2011.

Present: McHugh, Smith, & Trainor, JJ.

*Tobacco. Boston. Public Health. Municipal Corporations,* Board of health,
Regulations. *Regulation. Administrative Law,* Regulations. *Constitutional
Law,* Equal protection of laws.

A regulation promulgated by the Boston public health commission (commis-
sion), banning the sale of cigar wraps in the city of Boston, was not
arbitrary, capricious, or in excess of the commission's power, where the
regulation was rationally related to a legitimate, health-related purpose,
i.e., protection of the health of Boston's young people from the harmful ef-
fects of tobacco products. [826-829]
In a civil action brought by manufacturers of cigar wraps challenging a regula-
tion, promulgated by the Boston public health commission (commission),
that banned the sale of cigar wraps in the city of Boston, the manufacturers'
failure to raise, at the trial court level, the issue whether the regulation
impermissibly discriminated on the basis of race constituted a waiver of the
issue on appeal; moreover, even if the manufacturers could have raised the
issue on appeal, they failed to make the required showing that the regulation
was racially discriminatory either in purpose or in effect. [829-831]
A regulation promulgated by the Boston public health commission (commis-
sion), banning the sale of cigar wraps in the city of Boston, did not conflict
with State and Federal controlled substances statutes, where those statutes
exclude tobacco products from their scope; further, the regulation did not
conflict with State statutes regulating and taxing the sale of tobacco products.
[831-834]

Civil action commenced in the Superior Court Department on
January 14, 2009.

The case was heard by *Raymond J. Brassard,* J.

*Andrew J. McElaney, Jr. (Jonah M. Fecteau* with him) for the
plaintiffs.

*Nakisha L. Skinner* for the defendant.

[1]New Image Global, Inc.

McHugh, J. RYO Cigar Association, Inc., a trade association of cigar wrap manufacturers, and New Image Global, Inc., a wrap manufacturer (collectively, the manufacturers), appeal from a judgment of the Superior Court dismissing, after a two-day trial without a jury, their complaint for declaratory and injunctive relief. The complaint sought an injunction against enforcement of a regulation issued by the defendant, Boston public health commission (commission), banning the sale of cigar wraps in the city of Boston; the complaint also sought declarations to the effect that the ban was impermissible on several grounds. Here, the manufacturers argue that the regulation conflicts with State and Federal law, is unreasonable, and violates principles of equal protection. We disagree and affirm the judgment.

*Facts.* The manufacturers have no real quarrel with the facts found by the trial judge. The commission was created in 1995 by St. 1995, c. 147, §§ 1-15, also known as the Boston Public Health Act of 1995 (1995 act). The commission replaced what had been Boston's board of health and hospitals, and the 1995 act granted the commission broad powers to regulate health and certain health care providers within Boston, like Boston City Hospital. See St. 1995, c. 147, § 1. "[E]xercise by the commission of the powers conferred by this act shall be deemed and held to be the performance of an essential public function." St. 1995, c. 147, § 3(*a*).

On December 11, 2008, the commission enacted the regulation at issue, which, by its terms, became effective sixty days later. Entitled "Regulation Restricting the Sale of Tobacco Products in the City of Boston," the regulation, among other things, bans the sale of cigar wraps[2] in Boston.[3] The commis-

---

[2]The regulation uses the term "blunt wrap," which it defines as a "cigarette-like rolling paper that is thick and dark and usually made from tobacco leaves. Blunt wraps come in flavored varieties and are heavily marketed to the youth and often used as drug paraphernalia." The judge found, however, that "blunt wrap" "is a registered trademark of one of the three manufacturers of cigar wraps in the United States." He also found that manufacturers and users alike refer colloquially to the wraps as "cigar blunts," much as gelatin is often referred to as Jello and that, although "use of the term blunt wrap in the regulation . . . is unfortunate, . . . obviously the purpose or intent [of] the definition [is] . . . clear. In this small respect the regulation is easily modified." Here, the manufacturers raise no issue involving the definition the regulation

sion issued the regulation after a series of hearings.[4] As stated in the regulation, the commission found that "tobacco is one of the leading causes of death in the United States and lung cancer, which has a correlation to smoking, has been the leading cause of cancer death among Boston residents." The commission also found that "educational institutions in the City of Boston . . . sell tobacco products to the younger population, which is particularly at risk for becoming smokers" and that "there are certain tobacco products such as [cigar wraps] that are frequently marketed and sold to the youth and are also known to be used as drug paraphernalia." From those findings, the commission concluded "that it is important that the sale of tobacco products be banned by educational and health care institutions in the City of Boston and that [cigar] wraps also be banned in furtherance of [the commission's] mission to protect, promote and preserve the health and well-being of Boston citizens."

Insofar as cigar wraps are concerned, the judge's findings paralleled and expanded upon those of the commission. He found that cigar wraps come in a variety of flavors[5] and are sold in brightly colored packages for less than $1.50 each. Cigar wraps are used, particularly by young urban males, to create custom marijuana cigarettes and have been marketed through use of marijuana imagery. Indeed, two of the exhibits introduced at the trial were wraps named "kush" and "purple

_____

contains. Because "cigar wrap" is the products' generic name and has been used frequently and without objection during the litigation, we refer to the banned products as "cigar wraps" instead of "cigar blunts," their trade and colloquial name.

[3]The regulation also bans the sale of "tobacco products" in any "health care institution," i.e., an entity licensed by the Commonwealth's Department of Health pursuant to G. L. c. 112, or in an educational institution. The latter bans are not at issue in this litigation. The regulation defines tobacco products as "any substance containing tobacco leaf, including but not limited to cigarettes, cigars, pipe, tobacco, snuff, chewing tobacco and dipping tobacco."

[4]The commission issued the regulation after two meetings of the commission's board of directors in the summer and fall of 2008 at which the board discussed tobacco regulation. The commission then held two public hearings on October 8, 2008, at which it heard testimony about cigar wraps and their health effects. It also conducted surveys, discussed later in this opinion, regarding sales of tobacco products to people under the age of eighteen.

[5]Exhibits introduced during the course of the trial featured passion fruit, grape, blueberry, watermelon, and "wet mango" flavored wraps as well as one labeled "flavorless."

haze" which, the judge found, are two of many common syno-nyms for marijuana. One manufacturer, who is not a party to this action but is a member of the association, offered on its Internet Web site a compact disc (CD) entitled "Smokin Day-Pt.2," which features recording artists including 50 Cent, Snoop Dogg, and Lloyd Banks performing numbers such as "I Get High," "High Than a Muthafucka," "Let's Get High," and "Get High All the Time." The lyrics, many of which the interested reader can find on the Internet, are liberally sprinkled with references to "getting high." And, as an aid to listeners who for some reason need help with translation, the CD liner notes display large pictures of marijuana leaves.[6]

The judge found that there was an association between cigar wraps and marijuana use, but he also found that "a high percent-age of long term smokers start to smoke below the age of 18 . . . [and that] young people prefer cigar wraps to cigars [as a medium for smoking marijuana]. . . . [M]arijuana use is of serious concern because there is some evidence of an associa-tion between marijuana use and future drug use involving more serious drugs."

But marijuana was neither the commission's nor the judge's only focus. The judge found, and the manufacturers do not contest, that tobacco is one of the leading causes of lung cancer and that lung cancer has been the leading cause of cancer death among Boston residents. He also found that, in the summer of 2008, the commission investigated sales of cigar wraps in approximately 900 stores in Boston in an effort to determine how often cigarettes and cigar wraps were being sold to individu-als below eighteen years of age, to whom sale of tobacco prod-ucts is illegal. See G. L. c. 64C, § 10; G. L. c. 94, § 307C; 940 Code Mass. Regs. § 21.04 (2000). The violation rate for

---

[6]After a commission witness testified about the CD and the Internet Web site on which it was offered, a witness for the manufacturers testified, in the words of the judge's finding, that "he was very much offended and appalled by what the [manufacturer offering the CD] had done. He promptly followed up on this concern by seeking to reach the CEO of [the firm], which is a member of the RYO Trade Association . . . . The gentleman was on a long honeymoon, but others in his firm reported that the matter would be im-mediately removed and said words to the effect that it was an error caused by an exuberant webmaster situated in Denver."

cigarettes was approximately five percent, while the violation rate for other tobacco products, including cigar wraps, was approximately twelve percent. Those results are consistent with an earlier study prepared by the Commonwealth's Department of Health based on a Statewide survey. The results led the judge to conclude that

> "reasonable public officials in a reasonable legislative type body, like the Boston Public Health Commission, [were] certainly entitled to conclude that both cigars and cigar wraps were being sold at a high rate unlawfully to people below the age of 18. This of course presented a health problem to the Boston Public Health Commission wholly apart from the use of such products, cigars or cigar wraps, with an unlawful substance for anyone at any age, specifically marijuana."

Based on all of those findings, the judge rejected the manufacturers' claims that the regulatory ban violated principles of equal protection, took their property without just compensation, and was arbitrary and capricious, thereby violating their right to due process of law. On the basis of those rulings, judgment entered dismissing the manufacturers' complaint, and this appeal followed.

*Discussion.* On appeal, the manufacturers make three arguments. One, that the regulation is arbitrary, capricious, and beyond the commission's power, was an argument made and rejected below. The other two, though, are new. The first of these new arguments is that the regulation violates the equal protection rights of young African-American males; the second is that the regulation conflicts in numerous ways with State and Federal law. While we are not required to consider the latter two arguments, see, e.g., *Albert* v. *Municipal Ct. of Boston*, 388 Mass. 491, 493-494 (1983), all issues have been fully briefed by both sides and we therefore consider them all.

a. *Rational basis for the regulation.* As we begin an analysis of the manufacturers' claim that the regulation is arbitrary and capricious, it is important to keep in mind that the commission and all other local boards of health are statutorily empowered to promulgate reasonable health regulations. See G. L. c. 111,

§ 31. The commission's power to promulgate such regulations is specifically recognized in St. 1995, c. 147, § 7(*a*)(15), which provides the commission with the broad power to

> "adopt, amend and repeal reasonable health regulations not inconsistent with any public health regulation of the state department of public health or with any other provision of law, and [to] prescribe for any violation of a health regulation made under this clause a fine according to the nature of the offense."

As a general rule, we give health regulations promulgated by local boards like the commission the kind of deference we accord statutes. See *Tri-Nel Mgmt., Inc.* v. *Board of Health of Barnstable*, 433 Mass. 217, 220 (2001); *American Lithuanian Naturalization Club, Athol, Mass., Inc.* v. *Board of Health of Athol*, 446 Mass. 310, 317 (2006). Accordingly, "[h]ealth regulations have a strong presumption of validity, and, when assessing a regulation's 'reasonableness,' all rational presumptions are made in favor of the validity of the regulation." *Tri-Nel Mgmt., Inc., supra.* See *American Lithuanian Naturalization Club, Athol, Mass., Inc., supra.* As a consequence, "[a] plaintiff challenging a health regulation must prove that the regulation 'cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it.' " *Ibid.*, quoting from *Druzik* v. *Board of Health of Haverhill*, 324 Mass. 129, 138 (1949). See *Tri-Nel Mgmt., Inc., supra.* Put another way, those who challenge such regulations must prove that "there is no rational connection between the regulation and the public purpose to be achieved." *Hamel* v. *Board of Health of Edgartown*, 40 Mass. App. Ct. 420, 423 (1996). See *American Lithuanian Naturalization Club, Athol, Mass., Inc., supra* at 319.[7]

In Massachusetts, various forms and methods for distribution

---

[7]The deference accorded the actions of local boards of health in Massachusetts is reflected in many decisions regulating or banning otherwise legal activities. See, e.g., *Board of Health of Franklin* v. *Hass*, 342 Mass. 421, 422 (1961) (ban on piggeries); *Moysenko* v. *Board of Health of N. Andover*, 347 Mass. 305, 307-308 (1964) (piggeries banned even if ban is tantamount to banning an entire profession); *Take Five Vending, Ltd.* v. *Provincetown*, 415 Mass. 741, 749 (1993) (ban on cigarette vending machines by town); *Patton* v. *Marlborough*, 415 Mass. 750, 751 (1993) (ban on cigarette vending machines

of tobacco products are regulated at the State and local level. See, e.g., *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525 (2001) (State regulation of tobacco sales partially upheld); *Take Five Vending, Ltd.* v. *Provincetown*, 415 Mass. 741, 742 (1993) (town ban on cigarette vending machines upheld); *Patton* v. *Marlborough*, 415 Mass. 750, 751 (1993) (limited ban on cigarette vending machines by local board of health upheld); G. L. c. 270, § 6 (imposing an age limit for tobacco sales). Indeed, on a number of occasions, the Supreme Judicial Court has "recognized the ill effects of tobacco use, particularly when it involves minors, as a legitimate municipal health concern justifying municipal regulation of tobacco products." *Tri-Nel Mgmt., Inc.*, 433 Mass. at 222, citing *Patton* v. *Marlborough, supra* at 751-752. See also *Take Five Vending, Ltd., supra* at 748-749.

The regulation challenged here fits comfortably within the zone delineated by prior tobacco regulations.[8] Cigar wraps, the regulatory target, are tobacco products. The regulation's stated

---

by local board of health); *Tri-Nel Mgmt., Inc.* v. *Board of Health of Barnstable*, 433 Mass. at 220 (ban on smoking in all food service establishments including bars); *American Lithuanian Naturalization Club, Athol, Mass., Inc.* v. *Board of Health of Athol*, 446 Mass. at 311 (ban on smoking in private clubs); *American Friends Serv. Comm. of W. Mass.* v. *Commissioner of the Dept. of Envtl. Protection*, 30 Mass. App. Ct. 457, 460 (1991) (no appeal to Department of Environmental Protection for health board's finding that anthrax research did not present an immediate public health danger); *Hamel* v. *Board of Health of Edgartown*, 40 Mass. App. Ct. at 423-424 (building guesthouses in particular area). The deference accorded such regulations in Massachusetts is not unique. See, e.g., *Greater Chicago Combine & Center, Inc.* v. *Chicago*, 431 F.3d 1065 (7th Cir. 2005) (ban on keeping homing pigeons in residential areas); *American Canine Foundation* v. *Aurora*, 618 F. Supp. 2d 1271 (D. Co. 2009) (ban on private ownership of certain breeds of dogs); *General Food Vending, Inc.* v. *Westfield*, 288 N.J. Super. 442 (1995) (ban on cigarette vending machines); *Chiropractic Assn. of N.Y.* v. *Hilleboe*, 12 N.Y. 2d 109 (1962) (banning chiropractors from taking X-rays of people). But see *Baxter Springs* v. *Bryant*, 226 Kan. 383 (1979) (ban on dancing by fully clothed patrons where alcohol is served is impermissible ban); *D.A.B.E., Inc.* v. *Toledo-Lucas County Bd. of Health*, 96 Ohio St. 3d 250 (2002) (local health board did not have authority to ban smoking in all public places).

[8]There is no evidence in the record or claim by the manufacturers that the ban was the result of an unreasonable or arbitrary process. As previously noted, before enacting the ban, the commission considered studies involving the sale of cigar wraps and marketing strategies surrounding those sales, discussed cigar wraps and tobacco regulation at two meetings, and held two public hearings on the subject.

purpose is the protection of public health, particularly the health of Boston's young people, from the harmful effects of tobacco products. That purpose is well within the commission's area of responsibility. Particularly in light of the judge's finding that underage sales of cigars and cigar wraps in Massachusetts are double the rate of underage cigarette sales, and his finding that the marketing strategies employed by cigar wrap manufacturers specifically target young people, the ban is rationally related to a legitimate, health-related purpose.[9]

To be sure, consumption of tobacco products other than cigar wraps also has an adverse impact on public health. But that provides no basis for invalidating the regulation, for the commission is entitled to act incrementally and is not saddled with a choice between comprehensive regulation and no regulation at all. See *Federal Communications Commn.* v. *Beach Communications, Inc.*, 508 U.S. 307, 316 (1993), quoting from *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955) (legislative body "may select one phase of one field and apply a remedy there, neglecting the others"); *Steinbergh* v. *Cambridge*, 413 Mass. 736, 746-747 (1992), cert. denied, 508 U.S. 909 (1993). The regulation, in sum, is not arbitrary, capricious, or in excess of the commission's power.

b. *Equal protection of the laws.* In the Superior Court, the manufacturers' equal protection argument was that the regulation impermissibly treated them differently from cigar makers. They did not argue that the regulation also impermissibly discriminated on the basis of race. Indeed, in the requests for conclusions of law they filed in the Superior Court, the manufacturers said that the regulation should be "evaluated for equal protection purposes under the so-called 'rational basis' test because it 'neither burden[s] a fundamental right nor discriminate[s] on the basis of a suspect classification.' " Moreover, after the evidence had closed, the trial judge said, without objection, that "[t]he equal protection test here everyone agrees is the rational basis test . . . [because] [t]his is a regulation

_____

[9]Despite the manufacturers' claim that the commission banned the sale of cigar wraps because they are used with marijuana, the trial judge found that the wraps themselves "presented a health problem to the [commission] wholly apart from the use of such products . . . with an unlawful substance."

that does not implicate either fundamental rights or suspect classes." As noted earlier, the manufacturers' failure to raise the racial issue at trial means that they cannot do so here.

Even if they could raise the issue, though, they would fail, for in order to succeed, they would have to show that although the ban is facially neutral, it is in fact racially discriminatory both in purpose and in effect. See generally *Washington* v. *Davis*, 426 U.S. 229, 240-242 (1976). On this record, they can make no such showing.

In examining the intent or purpose of the regulation, factors such as its historical background, the specific series of events leading up to its enactment, departures from standard procedures, and the legal and administrative history of the enactment can be considered. See *Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266-268 (1977). While the *Arlington Heights* factors are not exhaustive, they remain an important starting point for any inquiry into intent. *Id.* at 268. See *Anderson* v. *Boston*, 375 F.3d 71, 84-90 (1st Cir. 2004); *Shabazz* v. *Cole*, 69 F. Supp. 2d 177, 209 (D. Mass. 1999).

Here, the manufacturers support their equal protection argument by pointing to discussions in commission proceedings to the effect that the manufacturers' marketing campaign targeted young African-American males and that use of cigar wraps had "increase[d] especially among African-Americans associated with urban culture, hip hop." But those discussions dealt with cause and effect, not racial discrimination. To say that the manufacturers created a marketing strategy with racial and cultural components, that the marketing strategy appeared to be working, and that the campaign's apparent success was presenting a health hazard to the targets of the strategy is to engage in a rational process for exploring dangers to public health. Thus, the manufacturers' argument amounts to a contention that the nature of the marketing strategy they created immunizes the health effects of that strategy from regulatory scrutiny. At best, the argument is something of a self-wielding sword and, in any event, there is no such immunity. See, e.g., *United States* v. *Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 629-630 (D.D.C. 2006), aff'd, 566 F.3d 1095 (D.C. Cir. 2009), cert. denied, 130 S. Ct. 3501 (2010) (discussing Brown & Williamson's "Kool Mixx" cigarette campaign).

As for effect, although the record contains much evidence, virtually all of which is undisputed, to show that cigar wraps are reaching young people at significant rates, there is no evidence of the percentage of the wraps purchased by African-Americans or that African-Americans were disproportionately denied wraps because of the regulation. The "cultural" appeal of the products does not necessarily define the purchasers or identify with any necessary accuracy those who would be affected most by a ban on sales, for cultural appeals frequently spread well beyond the boundaries of the culture that produced them.

c. *Asserted conflict with State and Federal law.* Turning finally to the manufacturers' claim that the regulation is inconsistent with State and Federal law, another claim they did not raise in the Superior Court,[10] we recognize that "[a] town may not promulgate a regulation that is inconsistent with State law." *American Lithuanian Naturalization Club, Athol, Mass., Inc.* v. *Board of Health of Athol*, 446 Mass. at 321, citing art. 2, § 6, of the Amendments to the Massachusetts Constitution, as amended by art. 89 of the Amendments. Nor may a State, and thus logically a town, promulgate regulations that are inconsistent with a Federal law. See *Sawash* v. *Suburban Welders Supply Co.*, 407 Mass. 311, 315 (1990); *Boston* v. *Commonwealth Employment Relations Bd.*, 453 Mass. 389, 396 (2009); *Heinricher* v. *Volvo Car Corp.*, 61 Mass. App. Ct 313, 316 (2004). "In assessing whether a reasonable health regulation is inconsistent with a State statute, [however,] we will afford the local board ' "considerable latitude," requiring a "sharp conflict" between the [regulation] and the statute before invalidating the [regulation].' " *Tri-Nel Mgmt., Inc.* v. *Board of Health of Barnstable*, 433 Mass. at 223, quoting from *Take Five Vending, Ltd.* v. *Provincetown*, 415 Mass. at 744. See *American Lithuanian Naturalization Club, Athol, Mass., Inc.*, *supra*. "Such a conflict 'appears when either the legislative intent to preclude local action is clear, or, absent plain expression of such intent, the purpose of the statute cannot be achieved in the face of the local [regulation].' " *Tri-Nel Mgmt., Inc.*, *supra*, quoting from *Take Five Vending, Ltd.*, *supra*.

---

[10]The manufacturers did not present these arguments below, but now contend that they are not waived because conflict of law is a part of any inquiry into the reasonableness of the regulation and they made an unreasonableness argument below. The waiver issue notwithstanding, we take up the conflict issues.

The manufacturers claim that the regulation conflicts with the State and Federal controlled substances statutes and with State statutes regulating and taxing the sale of tobacco products. Dealing first with the controlled substances statutes, the Massachusetts Controlled Substance Act, G. L. c. 94C, and the Federal Controlled Substance Act, 21 U.S.C. § 801 (2006), regulate "controlled substances" and "drug paraphernalia," categories from which tobacco products are specifically excluded.[11] See 21 U.S.C. §§ 802(6), 812, 863(f) (2006); G. L. c. 94C, §§ 1, 2(*d*). The manufacturers argue, therefore, that

---

[11]General Laws c. 94C, § 2(*d*), inserted by St. 1971, c. 1071, § 1, provides that the provisions of the Controlled Substances Act do not apply to "distilled spirits, wine, malt beverages, or tobacco, as those terms are defined or used in subtitle E of the Internal Revenue Code of 1954." Similarly, the Federal statute defines "controlled substances" as being "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter. The term does not include distilled spirits, wine, malt beverages, or tobacco, as those terms are defined or used in subtitle E of the Internal Revenue Code of 1986." 21 U.S.C. § 802(6) (2006). Section 812 of 21 U.S.C. (2006) contains schedules of controlled substances regulated by the Federal act, and tobacco is not listed among them. See *National Org. for Reform of Marijuana Laws v. Bell*, 488 F. Supp 123, 137 (D.C.D.C. 1980). Both statutes define "drug paraphernalia" in similar terms. General Laws c. 94C, § 1, as amended through St. 2006, c. 172, § 1, provides that "[d]rug paraphernalia" consists of "all equipment, products, devices and materials of any kind which are primarily intended or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this chapter." It also contains a nonexclusive list of certain items that are "[d]rug paraphernalia" and another nonexclusive list of factors to be considered in determining whether an item not specifically listed nevertheless is "drug paraphernalia." The pertinent section of the Federal statute, 21 U.S.C. § 863 (2006), defines "drug paraphernalia" as "any equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance, possession of which is unlawful under this subchapter. It includes items primarily intended or designed for use in ingesting, inhaling, or otherwise introducing marijuana, cocaine, hashish, hashish oil, PCP, methamphetamine, or amphetamines into the human body . . . ." The section also continues with a nonexclusive list of specific types of drug paraphernalia and ends with a statement indicating that it excludes cigar wraps. 21 U.S.C. § 863(f) ("[t]his section shall not apply to . . . any item that, in the normal lawful course of business, is . . . traditionally intended for use with tobacco products, including any pipe, paper, or accessory").

because a phrase in the regulation's preamble states that cigar wraps are "often used as drug paraphernalia," the regulation seeks to bring cigar wraps within an area of regulation from which they have been specifically excluded by comprehensive legislation.

But the commission stated that cigar wraps "often are used as drug paraphernalia," not that they are "drug paraphernalia." Nowhere in the record does the commission attempt to define the cigar wraps as anything but a tobacco product. We agree with the trial judge that the challenged statement goes "[l]ess toward a definition and more toward a finding" about cigar wraps' multiple uses. The finding is relevant to the health hazards posed by the wraps, for it suggests the likelihood that they will be consumed by people who otherwise would not use any tobacco products. Consideration of the health risks thereby created does not conflict with either the State or the Federal drug laws.

The manufacturers next claim that the Commonwealth's prohibition of sales of tobacco products to minors, G. L. c. 270, § 6, reflects an implied legislative intent to allow free and unfettered sale of tobacco products to adults, an intent thwarted by the regulation's flat ban on the sale of cigar wraps. The statute, however, evinces no such intent, and municipal regulation of tobacco sales in Massachusetts is a well recognized and proper exercise of local power. See note 7, *supra*. The regulation and G. L. c. 270, § 6, can operate synchronously and therefore are not in "sharp conflict."

Finally, the regulation does not conflict with G. L. c. 62C, §§ 16, 67, or G. L. c. 64C, § 7B. These statutes establish a taxation and licensing scheme governing the sale of tobacco products in the Commonwealth. The statutes are taxing statutes and only taxing statutes. *Take Five Vending, Ltd.* v. *Provincetown*, 415 Mass. at 745 ("licensing is only a method of tax collection"). As a taxation scheme, the statutes limit a locality's ability to interfere with the State's ability to collect taxes on tobacco products sold in the locality. *Ibid.* They do not reflect any legislative intent, express or implied, to "preempt local prohibition or regulation of" tobacco products. *Ibid.* See *American Lithuanian Naturalization Club, Athol, Mass., Inc.* v. *Board of Health of*

*Athol*, 446 Mass. at 314. The regulation and the taxation scheme coexist harmoniously.

In sum, the regulation is a permissible exercise of the commission's expansive authority to safeguard public health and is constitutional in its origins and operation. The regulation is rationally related to its permissible purpose of protecting residents of Boston, particularly young residents, from the harmful effects of tobacco use.

*Judgment affirmed.*