In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

Nos. 14-1270, 14-2284

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff,*

*v.*

FIRST CHOICE MANAGEMENT SERVICES, INC., *et al.*,

*Defendants,*

CRM ENERGY PARTNERS and JOHN W. HANNAH,

*Appellants,*

*v.*

JOSEPH D. BRADLEY, Receiver,

*Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:00-cv-00446-RLM-CAN — **Robert L. Miller, Jr.**, *Judge.*

———————————

SUBMITTED JULY 17, 2014 — DECIDED SEPTEMBER 11, 2014

———————————

Before POSNER, RIPPLE, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge*. This pair of appeals is a sequel to two previous appeals arising from the same lawsuit, see 678 F.3d 538 (7th Cir. 2012); 709 F.3d 685 (7th Cir. 2013), though there is little overlap, and only Bradley, the receiver, was a party to the previous appeals.

The case from which the appeals arise began in 2000 as a suit by the SEC charging First Choice Management Services and others with fraud in violation of federal securities law. The district court appointed a receiver to take charge of the defendants' assets and distribute them among the victims of the $31 million fraud. The receiver went hunting for the assets and found that some of them had been used to acquire oil and gas leases in Texas and Oklahoma. Those leases were therefore receivership assets. He has endeavored to sell them and use the proceeds of their sale to compensate the victims of the fraud. His efforts, which have continued for 14 years, have been slowed down by efforts of third parties to establish ownership interests in the leases.

The present appellants, CRM Energy Partners and John W. Hannah (who is CRM's owner and alter ego, and therefore needn't be discussed separately; we'll use "CRM" to denote both), are such third parties. Eventually CRM sought to intervene in the receivership proceeding in order to contest the receiver's proposed sale of oil leases in Osage, Oklahoma. CRM asserts an ownership interest in those leases and says it's been operating them since 2002. The receiver, however, considers the oil leases to be receivership assets because, as we noted earlier, they had been bought with proceeds of fraud. The district court denied CRM's motion to intervene and went on to approve the sale of the Osage leases to Wilson Operating Company, an oil company in

Tulsa. CRM appeals both from the denial of its motion to intervene (No. 14-1270 in this court) and from the district court's approval of the sale (No. 14-2284).

Back in 2002 CRM had made an agreement to sell the Osage leases to Branson Energy, Inc., for $300,000. It contends that Branson didn't pay for the leases, as the agreement required it to do (or at least did not make timely payment in full), and so CRM has had to continue to operate the leases and maintain the wells, at a total cost (it says) of more than $2.5 million. The following year, however, the receiver identified First Choice Management Services, the principal defendant in the SEC's suit, as the true owner of the Osage oil leases, and the district court issued an order freezing Branson's assets. Whether, as a result of its agreement with CRM, Branson had any interest in the Osage leases is unclear, but also, as will become clear, irrelevant.

Protracted negotiations between the receiver and claimants to the leases ensued, and included CRM, though it was not a litigant. With his funds running low as a result of expenses incurred in administering so long-lived a receivership, the receiver decided to sell the Osage leases, and in May 2013 he moved the district court for permission to sell them to Wilson Operating Company. CRM presumably knew of the motion, as it was public, and that the receiver believed that CRM had no compensable interest in the leases, as there was nothing in the motion to suggest that Wilson's purchase would be subject to a claim by CRM. In June 2013 the district court approved the receiver's plan and in January 2014 approved the sale price that the receiver had negotiated with Wilson. The court confirmed the sale itself in May of this year.

CRM moved to intervene in the receivership proceeding last December, to press its claim to a compensable interest in the leases. The district judge denied the motion as untimely, a recognized ground for denying a motion to intervene. E.g., *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995). CRM had known as early as January 2004, almost ten years before it filed its motion, that the receiver was claiming to own (as agent of the defrauded investors) the very leases that CRM claimed to own. In view of this clash of claims, had CRM moved to intervene then the motion would have been granted. Instead it waited for a decade minus two months—waited indeed until the protracted and expensive receivership was finally moving toward an end and the receiver's assets were dwindling.

CRM argues that the receiver had promised to protect its interests in the Osage leases, yet acknowledges that the receiver told the district court that he intended instead to prosecute the investors' claims to the leases. CRM responds weakly that it thought that once prosecution commenced, it would have an opportunity to defend its claims. It argues rather absurdly that the receiver shouldn't complain if he doesn't get $300,000 for the leases (the amount Wilson has agreed to pay), because the money will be eaten up by the receiver's attorneys' fees and thus not flow through to the defrauded investors. But attorneys' fees are a debt that the receiver will have to pay out of other funds, to the detriment of the fraud victims, if he doesn't get the $300,000.

By June 2013, when the district court granted his motion, the receiver was trying to sell the leases without regard to CRM's claims, which he refused to honor. CRM had no possible excuse for waiting for six months after that before mov-

ing to intervene—the very period during which the receiver was negotiating the sale to Wilson and seeking approval of the sale and sale price from the district court. While this was happening CRM stood by silent, waiting till the last minute to try to throw a monkey wrench into the deal.

The delay in seeking leave to intervene was inexcusable, and allowing CRM to intervene after the sale of the leases had been negotiated would have imposed substantial costs on the receiver and on Wilson, not to mention further burdening the district court, weary of this long-drawn-out litigation. An unexcused delay of six months in moving to intervene, which prejudices other parties to the litigation, justifies—indeed in the absence of extraordinary circumstances could well be thought to compel—denial of the motion. See *United States v. Ritchie Special Credit Investments, Ltd.*, 620 F.3d 824, 831–34 (8th Cir. 2010); *United States v. Covington County School District*, 499 F.3d 464, 466 (5th Cir. 2007); *United States v. British American Tobacco Australia Services, Ltd.*, 437 F.3d 1235, 1239 (D.C. Cir. 2006). It's true that in *Georgia v. U.S. Army Corps of Engineers*, 302 F.3d 1242, 1259–60 (11th Cir. 2002), the court had allowed intervention pursuant to a motion filed six months after the would-be intervenor had learned of the litigation, but the delay had not harmed any other parties to the suit. CRM's dawdling, in contrast, imposed costs on the receiver and on Wilson and made added work for the district court.

CRM's other appeal challenges the sale order as violating 28 U.S.C. § 2001(b), which imposes restrictions on the sale of property by receivers appointed by federal district courts. See, e.g., *United States v. Antiques Ltd. Partnership*, 2014 WL 3702580, at *4 (7th Cir. July 28, 2014). But having been turned

down as an intervenor, CRM did not become a party to the litigation in the district court and therefore has no right to appeal from rulings of the court other than, of course, the ruling denying intervention. The appeal must therefore be dismissed.

The order appealed from in No. 14-1270 is affirmed. Appeal No. 14-2284 is dismissed.